998 F.2d 1112
 UNITED STATES of America, Appellee,
v.
Nicholas L. BIANCO, a/k/a Nicky; Louis R. Failla, a/k/a
Louie; Gaetano J. Milano, a/k/a Costello; Americo
Petrillo, a/k/a Rico, a/k/a Cigar; Frank A. Pugliano, a/k/a
Frankie Pugs; Louis Pugliano, a/k/a Louie Pugs; Salvatore
D'Aquila, Jr., a/k/a Butch, Defendants-Appellants,
Richard Joseph Beedle; John F. Castagna, a/k/a Sonny;
Frank Colantoni; John E. Farrell, a/k/a Jack Sailorman,
a/k/a Jack Fast; Matthew L. Gugliemetti, Jr., a/k/a Matty;
Jack Johns, a/k/a Jackie, Defendants.
 Nos. 271-274, 287, 275 and 276, Dockets 91-1672, 91-1701 to 91-1706.
 United States Court of Appeals,
Second Circuit.
 Argued Nov. 18, 1992.
Decided July 19, 1993.
 
 Robert J. Devlin, Jr., Assistant U.S. Atty., D. Conn. (Albert S. Dabrowski, U.S. Atty., John H. Durham, Chief, Crim. Div., and Peter S. Jongbloed, Asst. U.S. Atty., of counsel), for appellee.
 Wendy Sibbison, Greenfield, MA (Stephanie A. Levin and Holly Sobel Armitage, of counsel), for defendant Milano.
 Barry M. Fallick, New York City (Rochman Platzer Fallick Rosmarin & Sternheim, Bobbi C. Sternheim, of counsel), for defendant D'Aquila, Jr.
 Jeremiah Donovan, Old Saybrook, CT, for defendant Failla.
 Richard S. Cramer, Wethersfield, CT, for Defendant Petrillo.
 William A. Dimitri, Jr., Providence, RI (Dimitri & Dimitri and Edward J. Romano, of counsel), for defendant Bianco.
 Vincent A. Bongiorni, Springfield, MA, for defendant Frank Pugliano.
 Harry L. Manion, Boston, MA (Anthony Cardinale and Vincent A. Bongiorni, of counsel), for defendant Louis Pugliano.
 Before PRATT and ALTIMARI, Circuit Judges, and HEANEY, Circuit Judge of the United States Court of Appeals for the Eighth Circuit, sitting by designation.
 GEORGE C. PRATT, Circuit Judge:
 
 
 1
 Trial of this organized-crime racketeering case commenced on April 17, 1991, and continued for 45 days. All seven defendants were convicted of belonging to a RICO conspiracy in violation of 18 U.S.C. § 1962(d). Five of them were convicted of related RICO substantive charges under 18 U.S.C. § 1962(c). Five were convicted of either conspiracy or substantive violations of 18 U.S.C. § 1959, which prohibits violent crime in aid of racketeering. Two were convicted of wire fraud in violation of 18 U.S.C. § 1343. One was convicted of extortion in violation of 18 U.S.C. § 894(c). All defendants have appealed.
 
 
 2
 The RICO charges, the principal crimes at issue, focused on the organized-crime Patriarca family of La Cosa Nostra (LCN) as the enterprise, which operated in New England over a period of many years under the leadership of Raymond L.S. Patriarca, who died in 1984 after designating his son, Raymond J. Patriarca, and William Grasso of New Haven, Connecticut, to head the enterprise.
 
 
 3
 The RICO charges were amply supported at trial by evidence that established not only the existence and history of the Patriarca family enterprise, but also each defendant's participation, or agreement to participate, in at least two of a long list of predicate acts of racketeering activity, including murder, drug trafficking, extortion, obstruction of justice, and gambling.
 
 
 4
 On appeal, defendants raise 42 different points and argue them in a total of 411 pages of briefing. They challenge the indictment, the jury charge, the sentences, the makeup of the jury, numerous evidentiary and procedural rulings, and the sufficiency of the evidence. To all that, the government responds with two briefs totaling 270 pages.
 
 
 5
 We have carefully reviewed all of defendants' arguments in light of the record, briefs, and oral argument, and we find most of them to be so lacking in merit as to be unworthy of discussion. One of defendants' arguments--their all-out attack against the "roving bug" tape recording of their LCN initiation ceremony--requires extensive analysis. Two other arguments--a claimed flaw in the makeup of the jury panel, and the admission of evidence obtained from a search of defendant Failla's private home in East Hartford, Connecticut--require brief comment. We will discuss first the latter two arguments, and then take up defendants' challenge to the government's "roving bug".
 
 
 6
 A. Jury Panel.
 
 
 7
 Defendant Milano is joined by his co-defendants in contending, for the first time on appeal, that the systematic, albeit inadvertent, exclusion of Blacks and Hispanics from the qualified jury wheel of the Hartford division of the District of Connecticut, between late 1989 and late August 1992, resulted in a violation of their sixth-amendment right to a fair trial. During this period, through an apparent computer-related error in processing names and addresses, the wheel included no citizens from the division's principal cities, Hartford and New Britain, where two-thirds of its voting-age, minority population resides. Defendants argue that this denied them a fair cross-section of jurors in the community.
 
 
 8
 Defendants base their claim, in large measure, on Judge T.F. Gilroy Daly's order dated August 26, 1992, made in a separate case, where the same defective jury panel had been used. United States v. Osorio, 801 F.Supp. 966 (D.Conn.1992) (inadvertent exclusion of residents of New Britain and Hartford communities from qualified jury wheel, resulting in exclusion of approximately two-thirds of Blacks and Hispanics in the division as source of names for grand jury selection, constituted systematic exclusion of those groups from jury-selection process and gave rise to prima facie fair-cross-section violation).
 
 
 9
 Osorio may well be distinguishable, because it was based on a timely pretrial challenge to the juror-selection process, and it involved a grand jury, not a petit jury. We do not, however, address the merits of defendants' challenge to their jury panel on this direct appeal after conviction. The issue was not presented to the district court; the record before us in this case provides an inadequate basis to resolve the issue. We therefore leave the issue to be pursued through whatever post-conviction remedies defendants may still have available to them.
 
 
 10
 B. Admission of Evidence Seized from Failla's Home.
 
 
 11
 Defendant Failla contends that the trial court erred in refusing to suppress certain evidence that was seized during a search of his home. Failla specifically claims that the warrant authorizing the search was defective because it was not particular enough to limit the scope of the search. The government responds by arguing that (1) the descriptions used in the warrant at issue are more narrow than descriptions upheld in other cases; (2) even if the warrant was not particular enough, any ambiguity in the warrant is resolved by reference to the affidavit; and (3) even if we were not to rely on the supporting affidavit, we should uphold the search under the good-faith exception of United States v. Leon, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984).
 
 
 12
 1. Background Facts.
 
 
 13
 The district court issued a warrant to search Failla's home at 58 Cloverdale Drive, East Hartford, Connecticut, and a small shed outside the home in order to seize the following items:
 
 
 14
 [N]otes, Ledgers, Envelopes, Papers, and Records Containing Initials, Names, Addresses, Dollar Amounts, Codes, Figures, and the Like: United States Currency.
 
 
 15
 No further limitation was made, nor was there any reference in the warrant itself to loansharking or any other crime. However, the supporting affidavit of special agent Richard T. Roberts set forth additional detail. It stated that the agents were looking for evidence of Failla's loansharking, described Failla's ongoing extortionate activities, and set forth portions of four conversations in which Failla stated that in his home he had records of his activities.
 
 
 16
 While the agents were executing their search of the house, they brought particular items they found to special agent William Hutton, who decided whether or not they should be seized. Hutton had familiarized himself with the warrant and its supporting affidavit, and was aware that he was looking for evidence of loansharking.
 
 
 17
 2. Challenge to the Breadth of the Warrant.
 
 
 18
 Failla moved in the district court to suppress any evidence seized during the course of the search on the ground that the warrant failed to particularly describe the property to be seized. This motion was denied after a hearing, and a number of the seized items were introduced during the trial.
 
 
 19
 The fourth amendment requires that warrants "particularly describ[e] * * * the person or things to be seized." U.S. Const. amend. IV. The particularity requirement "makes general searches * * * impossible and prevents the seizure of one thing under a warrant describing another." Marron v. United States, 275 U.S. 192, 196, 48 S.Ct. 74, 76, 72 L.Ed. 231 (1927). It prevents a "general, exploratory rummaging in a person's belongings." Coolidge v. New Hampshire, 403 U.S. 443, 467, 91 S.Ct. 2022, 2038, 29 L.Ed.2d 564 (1971).
 
 
 20
 The government points out that where agents have done all that could reasonably have been expected in drawing up a warrant, the inability to provide a more precise description of the criminal instruments to be found will not render the warrant defective. See, e.g., United States v. Young, 745 F.2d 733, 759 (2d Cir.1984) (courts tolerate greater degree of ambiguity where agents have done best they reasonably could under circumstances), cert. denied, 470 U.S. 1084, 105 S.Ct. 1842, 85 L.Ed.2d 142 (1985); United States v. Dunloy, 584 F.2d 6, 8 (2d Cir.1978) (warrant not impermissibly broad when officers were unable under circumstances to provide more precise description).
 
 
 21
 Those cases, however, do not help the government, for each involved a situation where the government was under emergency pressures that necessitated a broadly worded warrant. Significantly, there was no such emergency here. Moreover, along with the imprecise language in those cases, the warrants included precise descriptions of some items to be seized as well as specifications of the suspected crimes. See Young, 745 F.2d at 758 ("Quantities of heroin and other controlled substances, other chemical substances, equipment, utensils, paraphernalia, containers, money, notes, documents and papers and other evidence of a conspiracy to distribute and of the distribution * * * [of] controlled substance."); Dunloy, 584 F.2d at 8 (warrant to seize from safe deposit box "a quantity of cocaine, and additionally, all narcotic drug controlled substance, documents, records and other evidence of distribution and possession with intent to distribute narcotic drug controlled substances"). See also Andresen v. Maryland, 427 U.S. 463, 479, 96 S.Ct. 2737, 2748, 49 L.Ed.2d 627 (1976) (upholding search where exhaustive list of particularly described documents was coupled with open-ended nonparticular authorization). In this case, however, the warrant contained no particular description of items and made no mention of any criminal statute or criminal conduct.
 
 
 22
 The government's attempts to characterize other cases as supporting this high a level of ambiguity are easily distinguishable. The government states with misplaced confidence that "[c]ontrary to Failla's assertion * * *, the descriptions used in the warrant are more narrow then [sic] descriptions upheld in other cases." The government then points to United States v. Kepner, 843 F.2d 755, 757 (3d Cir.1988), in which the court upheld a warrant that authorized seizure of "documents, records and personal effects." In that case, though, the court found that the wording of the warrant was not overbroad, because the officers were searching for any proof that the defendant lived in the searched apartment. Id. In that situation, distinguishable from this case, anything with the defendant's name on it was evidence.
 
 
 23
 The other case the government points to in support of the broad wording of this warrant is United States v. Dennis, 625 F.2d 782, 792 (8th Cir.1980) ("certain books and records relating to the extortionate credit transaction business"). Even in Dennis, however, the documents had to relate to the crime of extortion, a limitation that is lacking here. If anything, therefore, Dennis undercuts the government's claim.
 
 
 24
 We held in United States v. Buck, 813 F.2d 588, 590-92 (2d Cir.), cert. denied, 484 U.S. 857, 108 S.Ct. 167, 98 L.Ed.2d 121 (1987), that a warrant authorizing officers to "seize any papers, things or property of any kind relating to previously described crime" was overly broad, because it "gave no limitation whatsoever on the kind of evidence sought", even though it did describe the crime under investigation. Here, however, the warrant, when viewed by itself, describes neither the precise items to be seized nor the possible crimes involved.
 
 
 25
 Based on current case law, and focusing solely on the warrant itself, we think that the warrant issued to search Failla's home was broader than we can accept. The fact that we have upheld similarly broad provisions when they were coupled with more particular limiting language, or at least tied to particular crimes, tends to indicate that standing alone, the highly generalized provisions in this case are not supportable.
 
 
 26
 3. Reliance on the Affidavit.
 
 
 27
 The failure of the warrant to particularly describe the items to be seized does not render the warrant incurably defective. While this court has not yet held that ambiguity in a warrant may be resolved by reference to the affidavit submitted to obtain the warrant, other courts have done so in circumstances where the affidavit was incorporated by reference into the warrant and attached to the warrant. See, e.g., United States v. Harris, 903 F.2d 770, 775 (10th Cir.1990); United States v. Vaughn, 830 F.2d 1185, 1186 (D.C.Cir.1987) (per curiam); United States v. Weinstein, 762 F.2d 1522, 1531 (11th Cir.), modified, 778 F.2d 673 (1985), cert. denied, 475 U.S. 1110, 106 S.Ct. 1519, 89 L.Ed.2d 917 (1986).
 
 
 28
 In this case, while the warrant refers to the affidavit there is no express language of incorporation. Nor does it appear that the affidavit was physically attached to the warrant. However, under the facts of this case, the functional purposes of those two requirements--to insure that all parties involved are informed of the scope of and limits upon the authorized search--were fully satisfied. See United States v. Wuagneux, 683 F.2d 1343, 1351, n. 6 (11th Cir.1982) (looking to underlying affidavit even where unattached to warrant, where searchers were adequately informed of limitations on search), cert. denied, 464 U.S. 814, 104 S.Ct. 69, 78 L.Ed.2d 83 (1983); United States v. Zanche, 541 F.Supp. 207, 213 (W.D.N.Y.1982) ("[i]t was also proper to examine the affidavit in deciding the degree of specificity required in the warrant"). Warrants must be read in a "commonsense" fashion, see United States v. Ventresca, 380 U.S. 102, 109, 85 S.Ct. 741, 746, 13 L.Ed.2d 684 (1965), and we should not adhere to formal requirements of incorporation and attachment where as here, it is clear that the involved parties were aware of the scope of and limitations on the search.
 
 
 29
 In this case, it is clear that both the federal agents and Failla were apprised of these factors. The affidavit was present at the time of the search, and spells out quite clearly the nature and purpose of the proposed search. It explains in detail the motivation behind the search and the nature of the documents sought. When the warrant and affidavit are read together, there is no ambiguity. Moreover, although the warrant may not have explicitly incorporated the affidavit, the presence and activity of agent Hutton, who had read the affidavit and who approved each seizure, satisfies us that the limitations included in the affidavit were observed.
 
 
 30
 In a broader sense, also, the record establishes that this was not an unreasonable search. Far from showing ambiguity, the documents and testimony show that the agents knew what they were looking for, and that in executing the search they took only that which they needed and which was contemplated by the authorizing papers. We caution law-enforcement agents, however, to be sensitive to the need to particularly describe in all warrants and applications the nature, extent and limits upon the search to be authorized in order to conform to the fourth amendment's particularity requirement. In this case, because of the presence at the search of the affidavit, agent Hutton's active supervision of the search, the specificity of the affidavit, and the fact that the agents did not exceed the scope of the warrant and affidavit when read together, we conclude that the search was reasonable.
 
 
 31
 4. Good Faith Issue.
 
 
 32
 In light of our conclusion that there was no violation of the fourth amendment's requirement of particularity, there is no need to consider whether under Leon, 468 U.S. 897, 104 S.Ct. 3405, the challenged evidence could also have been permitted on the theory that the executing officers had acted in good faith in relying on the warrant issued by the district court.
 
 
 33
 C. The "Roving Bug".
 
 
 34
 1. Background Facts.
 
 
 35
 In the summer of 1989 the FBI received information about a power struggle within the Patriarca family of LCN. In particular, a Patriarca family "underboss", William Grasso, and a Patriarca "soldier", Francis Salemme, were murdered. Believing further violence was likely, the FBI intensified its investigation into the Patriarca family.
 
 
 36
 The FBI believed that some members of the Patriarca family, including Joseph Russo, Vincent Ferrara, and Robert Carrozza, had begun to suspect efforts by law-enforcement officers to surveil their activities. To thwart those efforts, these individuals, along with others, had begun to communicate in varying ways and locations designed to make routine electronic surveillance difficult.
 
 
 37
 2. Application for the Interception Order.
 
 
 38
 By the middle of October 1989, the FBI had learned that the Patriarca family intended to induct several new members into the LCN. One of the candidates for induction was Vincent Federico, who was serving a Massachusetts prison sentence for murder. Recognizing the highly secretive nature of this event, as well as the likelihood that the Patriarca family would seek to avoid any government surveillance of it, the government agents decided to seek a warrant under 18 U.S.C. § 2518(11)(a) that would authorize a "roving bug", i.e., interception by electronic means of oral communications without specifying in advance exactly where or when the interception would occur. Specifying Russo, Ferrara, and Carozza as the particular targets of their proposed interception, the government applied to the district court in Massachusetts.
 
 
 39
 In compliance with the requirements of Title III, the United States Attorney's office submitted to the Department of Justice a proposed application of special attorney Diane Kottmyer, an affidavit of Walter J. Steffens of the FBI, and a proposed order. These papers were hand-delivered to the justice department on October 24, 1989. They described in detail the efforts by the targeted individuals to thwart surveillance, as well as information indicating that there was probable cause to believe that those individuals had engaged in two murders as well as other criminal activities.
 
 
 40
 The Steffens affidavit made no mention, however, of a possible LCN induction ceremony. The government claims to have omitted it deliberately for several reasons. First, it was satisfied that the affidavit supplied sufficient information to establish the required probable cause that criminal conversations would be obtained. Second, the government was concerned that if it revealed that particular confidential information in the affidavit, and should the information later get into the hands of the defendants, the Patriarca family would use violence or other illegal activity to obstruct justice, and the lives of the informants might be placed in jeopardy. In addition, the government did not yet know when and where, or even if, the ceremony would be held.
 
 
 41
 On October 26, 1989, the FBI learned that the ceremony was planned for Sunday, October 29, 1989, at or near Wellington Circle in Medford, Massachusetts. Suspecting that Federico might be inducted as one of the new members of the LCN, the FBI contacted the Massachusetts' Department of Correction and learned that Federico had requested a 28-hour furlough, beginning on the morning of October 29, 1989. Federico's furlough application reported that he intended to stay on Sunday, October 29, 1989, at the house of his brother-in-law, Stephan DiStefano, at 34 Guild Street, in Medford, an address that was near Wellington Circle.
 
 
 42
 Expecting the justice department's approval to arrive very soon, Special Attorney Kottmyer, on the morning of Friday, October 27, 1989, delivered to United States District Judge David Nelson, in Massachusetts, copies of her warrant application, Steffen's affidavit, and the proposed order. That evening, after the justice department had telefaxed its approval, Kottmyer met with Judge Nelson. The submitted papers did not reveal (1) anything about the anticipated induction ceremony, or (2) that an authorization for a similar roving-intercept order was simultaneously being sought in Rhode Island to investigate Nicholas Bianco, a defendant in the instant appeal. Kottmyer did, however, alert Judge Nelson that interceptions might take place that weekend.
 
 
 43
 3. The Order is Issued.
 
 
 44
 Judge Nelson signed the order approving a roving interception pursuant to 18 U.S.C. § 2518(11)(a). See generally Wire Electronic Communications Interception and Interception of Oral Communications Act, 18 U.S.C. § 2510, et seq. (1988). He was satisfied (1) that there was probable cause to believe the targeted individuals had committed and were continuing to commit crimes, including murder, through the RICO enterprise; (2) that normal investigative techniques had either been tried unsuccessfully or reasonably appeared unlikely to succeed if tried, or to be dangerous; (3) that there was probable cause to believe evidence of the specified crimes would be obtained through electronic surveillance of oral communications involving the targeted individuals; and (4) that it was not practical to specify each of the locations at which such communications would be intercepted. United States v. Ferrara, 771 F.Supp. 1266, 1280 (D.Mass.1991).
 
 
 45
 The order authorized the agents to "intercept oral communications made by, directed to, and/or in the presence of Joseph A. Russo, Vincent M. Ferrara, and Robert F. Carrozza concerning the [earlier identified] offenses, at such various and changing locations." It also authorized the agents to enter buildings surreptitiously to install listening devices, but it required that the court be notified of such entries and their location in advance, if possible, or as soon thereafter as possible, if advance notice were not feasible. The order specified that no interception could occur unless visual or other surveillance indicated that Russo, Ferrara and/or Carrozza was present.
 
 
 46
 4. Surreptitious Entry and Recording of the Conversations.
 
 
 47
 On Saturday afternoon, October 28, 1989, after observing the DiStefano family leave their home at 34 Guild Street, the FBI decided to install listening devices there. Kottmyer attempted to notify Judge Nelson by telephone of the government's intended entry, but she was unsuccessful.
 
 
 48
 The next morning at 9:00 a.m., however, she spoke with the judge in his chambers, advising him that pursuant to his order, a surreptitious entry had been made the previous evening, and that the authorized oral interceptions would likely proceed later that day.
 
 
 49
 Soon thereafter, agents observed Russo and Ferrara enter 34 Guild Street, and the interceptions began. During these interceptions the government overheard and recorded a ceremony that inducted into LCN four "made" members of the Patriarca family, including Federico. It recorded, apparently for the first time ever, an induction ceremony of LCN. As part of the ceremony (1) new inductees took an oath of lifetime allegiance, loyalty, devotion, and secrecy to the enterprise; (2) the "trigger" finger of each inductee was pricked, and his blood was placed on a picture of a saint that was set afire and held by the inductee in his hands, while he acknowledged that death was his only release from the organization; and (3) each inductee was assigned a "capo" or boss, who was to supervise his criminal activity.
 
 
 50
 In addition, the old members explained the origins, hundreds of years ago, of the LCN; the inductees promised that on orders they would kill their brother or son "without hesitation"; and the inductees were instructed that "all business deals legal and illegal" must be "brought to the table" before doing business with any nonmember of the organization. Ironically, at the end of the ceremony, one LCN member observed, "Only the 'f--in' ghost knows what really took place over here, today, by God." Unfortunately for these defendants and LCN, the "ghost" was not alone.
 
 
 51
 5. Indictments.
 
 
 52
 Based in part upon the evidence obtained through the "roving bug", indictments were returned, both in this case and in a separate case in the United States District Court for the District of Massachusetts. United States v. Ferrara, Crim. No. 89-00289 (D.Mass.). In Ferrara, seven defendants, including Raymond J. Patriarca, Joseph A. Russo, Vincent Ferrara, Robert Carrozza, Carmen Tortora, Dennis Lepore, and Pasquale Barrone, were charged in a superseding indictment filed on March 22, 1990, with being part of a secret enterprise, the Patriarca family, whose illegal activities included specific murders, drug trafficking, extortion, obstruction of justice, gambling, and other crimes. In the present case, Nicholas L. Bianco, Louis R. Failla, Americo Petrillo, Gaetano J. Milano, Salvatore D'Aquila, Jr., Frank A. Pugliano, and Louis Pugliano were charged in a superseding indictment filed December 7, 1990 with the same types of crimes as were charged in Ferrara.
 
 
 53
 6. Suppression Motions.
 
 
 54
 A principal pretrial issue in both cases was the admissibility of the "roving bug" tape recording of the LCN induction ceremony. The tapes captured the voices of two defendants in this case, Milano and Failla, and of four of the defendants charged in the Massachusetts indictment.
 
 
 55
 Motions to suppress the recordings of the ceremony were filed in both the Massachusetts case and this Connecticut case. On April 15, 1991, the Massachusetts district court (Wolf, J.), after extensive hearings, ruled the tape recordings admissible. Ferrara, 771 F.Supp. 1266. On April 19, 1991, the Connecticut district court (Nevas, J.) denied both the defendants' requests for an independent evidentiary hearing in this case and their motions to suppress. In denying the suppression motions, Judge Nevas adopted Judge Wolf's findings of fact and conclusions of law in their entirety.
 
 
 56
 Judge Wolf had found that the government, in applying for the "roving bug" order, had violated its statutory obligation to make a "full and complete statement" as to why specification of the place where interceptions would occur was not practical. Ferrara, 771 F.Supp. at 1273, 1278-80. Specifically, the government knew, but failed to disclose to Judge Nelson, the following: (1) confidential informants had stated that an LCN induction ceremony was planned to take place near Wellington Circle in Medford, Mass., at 11:00 a.m., on October 29, 1989; (2) Vincent Federico, a person whom the FBI suspected was to be inducted into the Patriarca family at the anticipated ceremony, had applied for a 28-hour furlough from the Massachusetts prison where he was confined, to begin Sunday morning, October 29, 1989; (3) Federico sought permission to be at 34 Guild Street, Medford, Mass. (his sister's residence) between 11:30 a.m. to 2:30 p.m. on the 29th; (4) because of the above information, the FBI had already set up visual surveillance of 34 Guild Street on October 27; and (5) about six hours before Kottmyer appeared before Judge Nelson, FBI agents saw two of the "roving bug" targets, capos Russo and Ferrara, emerge from 34 Guild Street and drive away in Federico's brother-in-law's car.
 
 
 57
 Based on these facts, Judge Wolf concluded that the government had failed to disclose to Judge Nelson that it had probable cause to believe that the conversations it wanted to intercept would occur on a particular date, October 29, 1989, and at a particular location, 34 Guild Street. The defendants argue that had these facts been disclosed, Judge Nelson would have been able to issue a standard Title III order to bug 34 Guild Street, rather than authorize the far broader "roving bug" interception.
 
 
 58
 While Judge Wolf concluded that the government had violated the roving-intercept provision of the electronic-surveillance statute by not telling Judge Nelson of a possible induction ceremony at 34 Guild Street, he also held that the affiant had acted in complete good faith, that her error was not made in reckless disregard for the truth or for the government's other obligations to the court, and that a fully informed judge would nevertheless have authorized the electronic surveillance at that address. Ferrara, 771 F.Supp. at 1280. He therefore denied the motion to suppress.
 
 
 59
 After reviewing the parties' submissions, the supplemental affidavits, a transcript of prosecutor Kottmyer's testimony, applicable case law, and Judge Wolf's opinion, Judge Nevas, the district judge in this case, adopted Judge Wolf's order "in its entirety" and similarly denied the suppression motion.
 
 
 60
 7. Issues on Appeal.
 
 
 61
 Defendants argue (a) that § 2518(11)(a), the "roving bug" provision, is unconstitutional because it violates the particularity requirement of the fourth amendment; (b) that the "roving bug" order issued under the statute was unconstitutional in failing to protect defendants' fourth-amendment interests; and (c) that the order was deficient because the government failed to disclose certain relevant information to the court in its application for the order. For any or all of these reasons, according to defendants, the recording of the LCN induction ceremony should have been suppressed.
 
 
 62
 (a) Constitutionality of § 2518(11)(a).
 
 
 63
 One of defendants' principal arguments challenges the constitutionality of 18 U.S.C. § 2518(11)(a). That section permits, in narrow situations, an order authorizing "roving" surveillance of oral conversations, i.e., interception of conversations without specifying in advance the place where the interception is to occur. Since the constitutionality of a statute is a legal issue, our review is de novo. United States v. Murphy, 979 F.2d 287, 289 (2d Cir.1992).
 
 
 64
 In 1968 congress sought to enact a statute that would properly protect the privacy of oral and wire communications, while providing a uniform basis for authorizing their interception in appropriate cases. S.Rep. No. 1097, 90th Cong., 2d Sess. 2, reprinted in 1968 U.S.C.C.A.N. 2112, 2157. With those concerns in mind, congress enacted Title III of the Omnibus Crime Control and Safe Streets Act of 1968 ("Title III"). Pub.L. No. 90-351, 82 Stat. 197, 217.
 
 
 65
 "The major purpose of Title III [was] to combat organized crime." S.Rep. No. 1097, reprinted in 1968 U.S.C.C.A.N. at 2157. It limits the scope of electronic surveillance by (1) requiring probable cause as to person, crime, conversation, and place or facility of communication, 18 U.S.C. §§ 2518(1)(b), (3)(a), (3)(b), (3)(d), (4); and (2) limiting the duration of surveillance to thirty days. 18 U.S.C. § 2518(1)(b). Surveillance that is properly authorized and carried out under Title III complies with the fourth amendment. See, e.g., United States v. Figueroa, 757 F.2d 466, 472 (2d Cir.), cert. denied, 474 U.S. 840, 106 S.Ct. 122, 88 L.Ed.2d 100 (1985).
 
 
 66
 As originally enacted, Title III required that each application for electronic surveillance also include: (1) "a particular description of the nature and location of the facilities from which or the place where the communication is to be intercepted"; and (2) a showing of probable cause for belief that this location will be used in connection with an offense. 18 U.S.C. §§ 2518(1)(b)(ii), 2518(3)(d). Under that version of the statute, the surveillance conducted in this case could not have been authorized, because the agents did not have sufficient advance notice of the place.
 
 
 67
 In 1986, however, congress expanded Title III through the Electronic Communications Privacy Act, Pub.L. No. 99-508, 100 Stat. 1848 (1986), to "update and clarify Federal privacy protections and standards in light of dramatic changes in new computer and telecommunications technologies." S.Rep. No. 541, 99th Cong.2d Sess. 32, reprinted in 1986 U.S.C.C.A.N. 3555, 3586. Under one of the amendments congress added a new § 2518(11), which authorizes the kind of "roving" electronic surveillance used in this case. Subsection (a) relates to the interception of an oral communication such as occurred in this case, and subsection (b) applies to the interception of a wire or electronic communication.
 
 Section (11)(a) reads as follows:
 
 68
 (11) The requirements of subsections (1)(b)(ii) and (3)(d) of this section relating to the specification of the facilities from which, or the place where the communication is to be intercepted do not apply if--
 
 
 69
 (a) in the case of an application with respect to the interception of an oral communication--
 
 
 70
 (i) the application is by a Federal investigative or law enforcement officer and is approved by the Attorney General, the Deputy Attorney General, the Associate Attorney General, an Assistant Attorney General, or an acting Assistant Attorney General;
 
 
 71
 (ii) the application contains a full and complete statement as to why such specification is not practical and identifies the person committing the offense and whose communications are to be intercepted;
 
 
 72
 (iii) the judge finds that such specification is not practical * * *.
 
 
 73
 18 U.S.C. § 2518(11)(a).
 
 
 74
 Thus, § 2518(11)(a) permits an oral-interception order without specifying the place of surveillance and without a showing of probable cause for belief that the place will be used in connection with an offense if: (1) the application is by a federal officer and is approved by a high federal official; (2) the application contains a full and complete statement as to why such specification is not practical and identifies the person committing the offense and whose communications are to be intercepted; and (3) the judge finds that specification is not practical. 18 U.S.C. § 2518(11)(a)(i)-(iii). Moreover, interceptions may not begin "until the * * * place where, the communication is to be intercepted is ascertained by the person implementing the interception order." 18 U.S.C. § 2518(12).
 
 
 75
 All other requirements of Title III--including duration, minimization, sealing, custody, exhaustion of other investigative techniques, and limitation to the crimes that may be investigated through the use of electronic surveillance--apply as well to a "roving bug". In this case, the district court judge who issued the order placed an additional restriction upon the government--that he be informed of any surreptitious entry by the agents in advance if possible, and if not possible, then after the entry was completed.
 
 
 76
 Section 2518(11) has been interpreted by United States courts only three times before this case. See United States v. Petti, 973 F.2d 1441 (9th Cir.1992) (warrant authorizing wiretap surveillance pursuant to § 2518(11)(b) met particularity requirement of fourth amendment), cert. denied, --- U.S. ----, 113 S.Ct. 1859, 123 L.Ed.2d 480 (1993); United States v. Silberman, 732 F.Supp. 1057 (S.D.Cal.1990) (affirmed in relevant part by Petti ); Ferrara, 771 F.Supp. 1266 (roving electronic surveillance provision of § 2518(11)(a) held constitutional as applied). Careful analysis is therefore necessary. We will now consider (1) the problem of standing, (2) the particularity requirement, and (3) our final conclusion as to constitutionality.
 
 
 77
 (1) Standing.
 
 
 78
 Intercepted conversations from the 34 Guild Street induction ceremony were introduced against all the defendants at trial. None of the defendants claims any proprietary or possessory interest in the house, and only defendants Milano and Failla were present when the recording was made. Given these circumstances, the government contends that only Milano and Failla have standing to challenge the roving order, and that none of the defendants has standing to challenge the surreptitious entry into the house at 34 Guild Street.
 
 
 79
 We have previously denied standing to defendants who seek to challenge electronic surveillance that occurred while they were at another's home. See United States v. Gallo, 863 F.2d 185, 192 (2d Cir.1988) (Title III suppression provisions to be construed in accordance with standing requirements of fourth amendment; defendants lacked standing to claim minimization violation regarding electronic surveillance at another's home), cert. denied, 489 U.S. 1083, 109 S.Ct. 1539, 103 L.Ed.2d 843 (1989); United States v. Fury, 554 F.2d 522, 526 (2d Cir.) (same), cert. denied, 433 U.S. 910, 97 S.Ct. 2978, 53 L.Ed.2d 1095 (1977).
 
 
 80
 While those cases dealt with a location-based surveillance statute, rather than with the person-based surveillance statute at issue here, we see no reason to depart from the general principle that standing to assert a fourth-amendment challenge requires a closer connection to the intrusion than merely being adversely affected by the use of its fruits at trial. We conclude that those defendants who were not present lack standing to challenge the interception. See United States v. Bynum, 513 F.2d 533, 535 (2d Cir.) (co-conspirators whose conversations were not intercepted, and who have no possessory interest in the premises subjected to electronic surveillance, lack standing), cert. denied, 423 U.S. 952, 96 S.Ct. 357, 46 L.Ed.2d 277 (1975). In other words, only Milano and Failla have standing to contest the order itself.
 
 
 81
 Since none of the defendants had any legitimate interest in the privacy of the 34 Guild Street residence before they arrived there, they lack standing to assert that the entry to install listening devices injured their rights. See United States v. Volpe, 430 F.Supp. 931, 945 (D.Conn.1977), aff'd, 578 F.2d 1372 (2d Cir.1978), cert. denied, 441 U.S. 930, 99 S.Ct. 2049, 60 L.Ed.2d 658 (1979).
 
 
 82
 (2) Particularity.
 
 
 83
 The defendants contend that "[t]he 1986 amendment to Title III, no matter how it is read does away with the particularity requirement of the Fourth Amendment and is an unconstitutional exercise of Congressional power." U.S. Const. Amend. IV.
 
 
 84
 The warrant clause of the fourth amendment provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized." Its purpose was to prevent general searches. Limiting any search authorization to specific areas and things for which there is probable cause ensures that the search "will be carefully tailored to its justifications, and will not take on the character of the wide-ranging exploratory searches the Framers intended to prohibit." Silberman, 732 F.Supp. at 1061 (quoting Maryland v. Garrison, 480 U.S. 79, 84, 107 S.Ct. 1013, 1016, 94 L.Ed.2d 72 (1987)).
 
 
 85
 If read literally, the fourth amendment would forbid a warrant that specifies no particular place for the search and leaves the location to be determined at a future time. The Supreme Court, however, has refused to apply the fourth amendment literally, preferring instead a flexible approach designed to keep pace with a technologically advancing society. See discussion Id. at 1061. It "has not simply frozen into constitutional law those law enforcement practices that existed at the time of the Fourth Amendment's passage." Payton v. New York, 445 U.S. 573, 591 n. 33, 100 S.Ct. 1371, 1382 n. 33, 63 L.Ed.2d 639 (1980). In short, the fourth amendment's "prohibition against 'unreasonable searches and seizures' must be interpreted 'in light of contemporary norms and conditions.' " Steagald v. United States, 451 U.S. 204, 217 n. 10, 101 S.Ct. 1642, 1650 n. 10, 68 L.Ed.2d 38 (1981).
 
 
 86
 Under its flexible interpretation, the Supreme Court in numerous cases has rejected the narrow shackles that might otherwise flow from a literal reading of the fourth amendment. See, e.g., United States v. Ross, 456 U.S. 798, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982) (automobile searches); Michigan v. Tyler, 436 U.S. 499, 98 S.Ct. 1942, 56 L.Ed.2d 486 (1978) (exigent circumstances); United States v. Brignoni-Ponce, 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975) (border search); Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) (stop and frisk); Harris v. United States, 390 U.S. 234, 88 S.Ct. 992, 19 L.Ed.2d 1067 (1968) ("plain view").
 
 
 87
 Section 2518(11)(a) specifically addresses some of the concerns expressed by the Supreme Court that warrants be particular; it requires a full and complete statement as to why a particular description of the location to be monitored is not practical. See 18 U.S.C. § 2518(11)(a)(ii). With regard to this section, congress cited an effort to thwart surveillance as an example of impracticality, stating:
 
 
 88
 The judge must find that the ordinary specification rules are not practical. Situations where ordinary specification rules would not be practical would include those where a suspect moves from room to room in a hotel to avoid a bug or where a suspect sets up a meeting with another suspect on a beach or a field. In such situations, the order would indicate authority to follow the suspect and engage in the interception once the targeted conversation occurs.
 
 
 89
 S.Rep. No. 541, 99th Cong., 2d Sess. 32, reprinted in 1986 U.S.C.C.A.N. 3555, 3586. Among the circumstances, therefore, in which congress intended the "roving bug" to be used was a situation, such as here, where the target is attempting to thwart surveillance. See Ferrara, 771 F.Supp. at 1289.
 
 
 90
 A "roving bug" order is analogous to the order under § 2518(11)(b) issued in Silberman. Silberman involved the interception of wire-tapped conversations under § 2518(11)(b), which, unlike § 2518(11)(a), specifically requires "a showing of a purpose on the part of that person to thwart interception by changing facilities." See 18 U.S.C. § 2518(11)(b)(ii). The court in Silberman held that the statute was constitutional as applied, and that once a judge determines that the location of a possible search is being purposely changed by suspects in order to evade detection or interception by law enforcement agents, an order expanding the scope of the search is clearly justified to counteract the attempted evasion. Silberman, 732 F.Supp. at 1062. A similar relaxed particularity standard should apply to oral interceptions under § 2518(11)(a), particularly when (1) congress cited an effort to thwart surveillance as an example of impracticality under § 2518(11)(a), and (2) the party attempting to evade detection is part of organized crime, which has always been one of the prime targets of Title III.
 
 
 91
 In addition, unlike other orders under Title III, which requires identification of the anticipated speaker only "if known", § 2518(1)(b)(iv), to satisfy the roving intercept statute, the person targeted for roving interception must be identified, and only conversation involving the specified individual may be intercepted. 18 U.S.C. §§ 2518(4)(c), 2518(11)(a)(ii).
 
 
 92
 The roving intercept statute also addresses the fourth amendment's requirement that the place to be searched be particularly described "by identifying that location in terms of where a specified individual engages in certain conversation." Ferrara, 771 F.Supp. at 1291. It requires that "interceptions will not begin until * * * the place where the communication is to be intercepted is ascertained." § 2518(12). Section 2518(11)(a)(ii) further provides for defining the place to be searched as the location at which the targeted person is discussing specified crimes. These requirements, when considered along with the other requirements of § 2518(11)(a) and Title III, are constitutionally sufficient to satisfy the particularity requirement of the fourth amendment.
 
 
 93
 (3) Final Conclusion as to Constitutionality of the Statute.
 
 
 94
 The interception of an oral conversation falls within the fourth amendment's protections, Berger v. State of New York, 388 U.S. 41, 51, 87 S.Ct. 1873, 1879-80, 18 L.Ed.2d 1040 (1967), and capturing a conversation through the use of electronic devices is a "search and seizure". Id. "[T]he underlying command of the Fourth Amendment is always that searches and seizures be reasonable * * *. The determination of the standard of reasonableness governing any specific class of searches requires 'balancing the need to search against the invasion which the search entails.' " New Jersey v. T.L.O., 469 U.S. 325, 337, 105 S.Ct. 733, 740, 83 L.Ed.2d 720 (1985).
 
 
 95
 Congress expressly recognized the importance of combatting organized crime as a major reason for enacting Title III. At the same time, congress imposed substantial conditions on the issuance of any order for electronic surveillance. When it turned to the "roving bug", congress added several more protections against arbitrary surveillance:
 
 
 96
 (1) It limited the number of people who may seek a roving oral intercept by requiring advance approval from certain high-ranking federal officials. 18 U.S.C. § 2518(11)(a)(i).
 
 
 97
 (2) It required "a full and complete statement" as to why specification of the place of interception is not practical. 18 U.S.C. § 2518(11)(a)(ii).
 
 
 98
 (3) It required identification of the persons committing the offense and whose conversations are to be intercepted. 18 U.S.C. § 2518(11)(a)(ii). In many cases, "such a limitation in fact protects the fourth amendment interests of innocent third-parties to an even greater extent than do the limitations imposed under a standard * * * order." Silberman, 732 F.Supp. at 1062.
 
 
 99
 (4) It permitted actual interception of communications to begin only when the place where the communication is to be intercepted is ascertained by the implementing agent. 18 U.S.C. § 2518(12).
 
 
 100
 (5) It retained all of the requirements of Title III--including duration, minimization, sealing, custody, exhaustion of other investigative techniques, and identification of the crimes that may be investigated through the use of electronic surveillance.
 
 
 101
 In short, the "roving bug" provision, when examined in light of the other limitations imposed under Title III, permits "no greater invasion of privacy than is necessary." Silberman, 732 F.Supp. at 1063 (quoting Katz v. United States, 389 U.S. 347, 355, 88 S.Ct. 507, 513, 19 L.Ed.2d 576 (1967)). Therefore, mindful not only of the grave law-enforcement purposes underlying § 2518, as well as the constitutional need to protect against arbitrary governmental intrusions into the privacy of individuals, we conclude that the safeguards required by congress provide adequate protection to preserve the constitutionality of interceptions of oral conversations when authorized under 18 U.S.C. § 2518(11)(a). We therefore reject defendants' constitutional challenge to the "roving bug" statute.
 
 
 102
 (b) Constitutionality of the Order.
 
 
 103
 Defendants also contend that even assuming the statute itself is constitutional, the provisions of the order issued in this case were inadequate to protect their constitutional interests. We disagree.
 
 
 104
 Judge Wolf's decision in Ferrara, adopted by Judge Nevas in this case, evaluated the order in light of law enforcement's obligation to combat organized crime as well as the need to provide constitutional safeguards against invasion of privacy. Judge Wolf correctly held that (1) the search in this case was reasonable; (2) the decision to authorize surveillance was made by an independent judge; (3) there was a strong showing of probable cause; (4) the order particularly described the thing to be intercepted--conversations of specified individuals about particular criminal activities; and (5) the order adequately described the place to be searched as the location at which a targeted individual is discussing the specified crimes. Ferrara, 771 F.Supp. at 1292-96.
 
 
 105
 The order also contained "provisions to minimize the risk that the roving authority it granted could be abused." Id. at 1294. It required notice of any surreptitious entry in advance, if possible, or as soon as possible thereafter--a procedure that provided the district judge with the opportunity to "revoke or revise the roving intercept Order if he perceived that the government was attempting too many intrusions, or seeking interceptions at sensitive locations." Id. See also Dalia v. United States, 441 U.S. 238, 258, 99 S.Ct. 1682, 1693-94, 60 L.Ed.2d 177 (1979). While the agents were unable to reach the district judge before entry, they did advise the judge within hours of the entry and before any interception began.
 
 
 106
 In addition, the order required the government to file seven-day progress reports with the judge. These reports would also provide the district court judge with information which he could use to revoke or revise the roving intercept order if he thought the government was abusing its authority.
 
 
 107
 Finally, the order satisfied the requirements of the warrant clause of the fourth amendment in that it was based on a strong showing of probable cause to believe that the targets were engaged in some of the serious crimes targeted by Title III.
 
 
 108
 Therefore, application of the "roving bug" statute through the order in this case resulted in a search and seizure that was reasonable within the meaning of the fourth amendment.
 
 
 109
 (c) Failure to Disclose.
 
 
 110
 (1) Section 2518(11)(a)(ii): Impracticality.
 
 
 111
 All defendants claim that the fruits of the roving-intercept order should have been suppressed because of the government's failure to comply with § 2518(11)(a)(ii), which requires the government to provide a "full and complete statement as to why * * * such specification [of the place where the communication is to be intercepted] is not practical." Specifically, they contend that the government did not disclose the information it had regarding the possibility that 34 Guild Street would be the site of a Mafia induction ceremony. Defendants further argue that when a central provision of Title III is violated, 18 U.S.C. § 2515 requires that the resulting evidence be suppressed. They contend that the court should look directly to the exclusionary rule of the statute, rather than to focus on fourth-amendment considerations or a Franks analysis. See Franks v. Delaware, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978).
 
 
 112
 Under Franks and its progeny, if a search warrant contains a false statement or omission, and the defendant makes a substantial preliminary showing (1) that the false statement or omission was knowingly and intentionally, or with reckless disregard for the truth, included by the government in a search warrant affidavit, (2) that the information was material, and (3) that with the affidavit's false or omitted material aside, the affidavit's remaining content is insufficient to establish probable cause, then the fruits of the search must be suppressed. Franks, 438 U.S. at 155-56, 98 S.Ct. at 2676-77.
 
 
 113
 Title III contains its own exclusionary rule. It provides that no intercepted communications can "be received in evidence in any trial * * * if the disclosure of that information would be in violation of this chapter." 18 U.S.C. § 2515. The specific grounds for exclusion under § 2515 are set forth in § 2518(10)(a). They are that: (i) the communication was unlawfully intercepted; (ii) the order of authorization or approval under which it was intercepted is insufficient on its face; or (iii) the interception was not made in conformity with the order of authorization or approval. 18 U.S.C. § 2518(10)(a).
 
 
 114
 The government claims that the statutory requirement of a "full and complete" statement was not violated here, but argues that even if it were, (1) the Franks standard is applicable, and (2) under that standard the undisclosed information was immaterial, and the issuing judge would have signed the order even with knowledge of the undisclosed material.
 
 
 115
 We agree with the district court's application of Franks and with its findings (1) that the defendants did not establish deliberate falsehood or reckless disregard for the truth by the government, and (2) that the nondisclosure of the 34 Guild Street information was immaterial.
 
 
 116
 When enacted in 1967, §§ 2515 and 2518(10)(a) were not intended "generally to press the scope of the suppression role beyond [then] present search and seizure law." S.Rep. No. 1097, 90th Cong., 2d Sess. 96 (1968), reprinted in 1968 U.S.C.C.A.N. 2112, 2185; Scott v. United States, 436 U.S. 128, 139, 98 S.Ct. 1717, 1724, 56 L.Ed.2d 168 (1978). At that time there was no good-faith or other exception to the judicially crafted exclusionary rule for violations of the fourth amendment. Ferrara, 771 F.Supp. at 1299. By 1984, the Supreme Court in Leon, 468 U.S. 897, 104 S.Ct. 3405, and in Franks, 438 U.S. 154, 98 S.Ct. 2674, had narrowed the circumstances in which to apply the exclusionary rule, and this left to the courts the dilemma of whether to apply the Franks standard to Title III cases.
 
 
 117
 Despite the existence of §§ 2515 and 2518(10)(a), several courts, including this circuit, have applied a Franks analysis to alleged falsehoods or omissions in wiretap affidavits and applications under Title III. United States v. Ferguson, 758 F.2d 843, 848 (2d Cir.), cert. denied, 474 U.S. 841, 106 S.Ct. 124, 88 L.Ed.2d 102 (1985); United States v. Mastroianni, 749 F.2d 900, 909 (1st Cir.1984); United States v. Leisure, 844 F.2d 1347, 1357 (8th Cir.), cert. denied, 488 U.S. 932, 109 S.Ct. 324, 102 L.Ed.2d 342 (1988); United States v. Ippolito, 774 F.2d 1482, 1485 (9th Cir.1985).
 
 
 118
 Use of the Franks standard is consistent with the purposes of § 2515, which are "not only to protect the privacy of communications, but also to ensure that the courts do not become partners to illegal conduct: the evidentiary prohibition was enacted also 'to protect the integrity of court and administrative proceedings.' " Gelbard v. United States, 408 U.S. 41, 51, 92 S.Ct. 2357, 2362-63, 33 L.Ed.2d 179 (1972) (citation omitted). Nothing in the Franks standard goes against the grain of these purposes. If anything, Franks enhances the protection of the defendants, by applying to the wiretap statute an important constitutional principle that has been accepted by all courts.
 
 
 119
 While the government should have disclosed to the court the information relating to 34 Guild Street, its failure to do so does not require suppression of the evidence in this case. As the district court properly found, the information was not essential for permitting the interceptions, because there was enough independent information of the nature of the suspects' crimes and their evasive methods to justify issuing the roving order, even without the information about 34 Guild Street. Moreover, even if the judge had been advised of the anticipated induction ceremony at 34 Guild Street, the information would not have eliminated the need for a roving order, because the members of the enterprise were trying to avoid detection, and could easily have changed the location at the last minute. Therefore, we agree with the district court that under the Franks standard the government's failure to disclose information about 34 Guild Street did not require suppression of the intercepted conversations.
 
 
 120
 (2) Sections 2518(1)(c) and (1)(e): Other Procedures and Applications.
 
 
 121
 Milano claims that the government violated 18 U.S.C. § 2518(1)(c) (requiring the government to inform the judge whether other investigative procedures have been tried and why they were unlikely to succeed) and § 2518(1)(e) (requiring the government to inform the judge of all previous applications for approval of interceptions involving any of the same persons involved in the application), and that the government's multiple violations of these disclosure provisions require suppression of the induction ceremony tape recordings.
 
 
 122
 At the time it applied for the roving bug in the District of Massachusetts, the government had already applied for two other Title III warrants against two of the people named in its application to Judge Nelson: an application in the District of Massachusetts for a warrant for electronic surveillance of Milano's car (the district court authorized the warrant); and an application in the District of Rhode Island for a roving intercept of Milano's co-defendant Nicholas Bianco (this application was submitted to the district court in Rhode Island simultaneously with the one submitted to Judge Nelson). In its application to Judge Nelson, the government informed him only of prior Title III applications naming Russo, Ferrara, and Carrozza, who were named as targets of the "roving bug" request, and did not mention the applications for surveillance of Milano and Bianco, who were not targets, but merely were mentioned in the affidavit.
 
 
 123
 Milano contends that the failure to disclose the Milano and Bianco surveillance applications constituted a violation of § 2518(1)(c), the "necessity" requirement, under which the government must inform the judge "as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed." Judge Wolf rejected this claim, concluding that subsection (1)(c) requires "disclosure only of 'normal' non-Title III investigative techniques" and not other electronic surveillance. Ferrara, 771 F.Supp. at 1313. Applying Franks, Judge Wolf also held that even if § 2518(1)(c) had been violated, suppression would be inappropriate because the information was not material and was not omitted to mislead Judge Nelson. We agree.
 
 
 124
 Several circuits, including our own, have held that subsection (1)(c) refers to non-electronic investigative techniques. See United States v. Torres, 901 F.2d 205, 231 (2d Cir.1990) ("Section 2518[ (1)(c) ] 'is simply designed to assure that wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime.' ") (quoting United States v. Kahn, 415 U.S. 143, 153 n. 12, 94 S.Ct. 977, 983 n. 12, 39 L.Ed.2d 225 (1974)); United States v. Lambert, 771 F.2d 83, 91 (6th Cir.), ("All that is required is that the investigators give serious consideration to the non-wiretap techniques prior to applying for wiretap authority and that the court be informed of the reasons for the investigators' belief that such non-wiretap techniques have been or will likely be inadequate."), cert. denied, 474 U.S. 1034, 106 S.Ct. 598, 88 L.Ed.2d 577 (1985); see also United States v. Uribe, 890 F.2d 554, 556 (1st Cir.1989) (the government is required to "make a reasonable good faith effort to run the gamut of normal investigative procedure before resorting to means so intrusive as electronic interception of telephone calls.") (quoting United States v. Hoffman, 832 F.2d 1299, 1306-07 (1st Cir.1987)).
 
 
 125
 The legislative history of subsection (1)(c) further confirms this view:
 
 
 126
 Normal investigative procedure would include, for example, standard visual or aural surveillance techniques by law enforcement officers, general questioning or interrogation under an immunity grant, use of regular search warrants, and the infiltration of conspiratorial groups by undercover agents or informants.
 
 
 127
 S.Rep. No. 1097, reprinted in 1968 U.S.C.C.A.N. at 2190.
 
 
 128
 Moreover, as Judge Wolf noted, the enactment of 18 U.S.C. § 2518(11) did not alter the requirements of subsection (1)(c), Ferrara, 771 F.Supp. at 1313, although it did modify other subsections, e.g., (1)(b)(ii). If the 1986 amendments were intended to modify subsection (1)(c), then congress would have explicitly done so.
 
 
 129
 Nothing in the plain language of subsection (1)(c), in the legislative history, or in the case law indicates that the term "other investigative procedures" must include other electronic surveillance. We conclude, therefore, that Judge Wolf correctly held that the government was not required by § 2518(1)(c) to disclose in its application the electronic surveillance matters concerning Bianco and Milano.
 
 
 130
 Milano also contends that the government violated § 2518(1)(e), which requires the government to inform the issuing judge of:all previous applications * * * for approval of interceptions of wire, oral, or electronic communications involving any of the same persons * * * specified in the application.
 
 
 131
 18 U.S.C. § 2518(1)(e).
 
 
 132
 Since the duty to disclose prior applications under § 2518(1)(e) covers all persons named in the application and not just those designated as "principal targets", Judge Wolf properly found that the provision was violated. Ferrara, 771 F.Supp. at 1315. He additionally found (1) that subsection (1)(e) goes beyond the requirements of the fourth amendment; (2) that it is therefore subject to the statutory exclusionary provisions of §§ 2515 and 2518(10); United States v. Donovan, 429 U.S. 413, 425, 97 S.Ct. 658, 666-67, 50 L.Ed.2d 652 (1977); (3) that subsection (1)(e) constitutes a non-central provision of Title III; (4) that the government's failure to comply with the requirements of subsection (1)(e) was in good faith and inadvertent error, and (5) suppression is neither permissible or appropriate. Ferrara, 771 F.Supp. at 1314. We agree with Judge Wolf's conclusions as well as with his application and analysis of Donovan and its progeny. Id. at 1314-17.
 
 
 133
 In Donovan, the Supreme Court considered a different "naming" subsection of 18 U.S.C. § 2518(1)(b)(iv). That subsection required the government to "name an individual if the government has probable cause to believe that the individual is engaged in the criminal activity under investigation and expects to intercept the individual's conversations." Donovan, 429 U.S. at 428, 97 S.Ct. at 668. The Court held that "naming" under that subsection was not a constitutional requirement, that it was subject to the exclusionary provisions of Title III, that it was deemed not to play a central, or even a functional, role in guarding against unwarranted use of wiretapping or electronic surveillance, and that the omission of names in that case was inadvertent and did not require suppression.
 
 
 134
 Several courts have interpreted Donovan to mean that even a violation of subsection (1)(e) does not require suppression. See United States v. Van Horn, 789 F.2d 1492, 1500 n. 6 (11th Cir.1986) (suppression not mandated by inadvertent noncompliance with § 2518(1)(e)), cert. denied, 479 U.S. 854, 107 S.Ct. 190, 93 L.Ed.2d 123 (1986); see also United States v. Sullivan, 586 F.Supp. 1314, 1323 (D.Mass.1984) ("It is difficult to see how suppression could be required for noncompliance with § 2518(1)(e) when it is not required for a violation of § 2518(1)(b)(iv).").
 
 
 135
 The evidence in this case demonstrates that the government believed that it was necessary to disclose prior applications concerning only the proposed targets of the "roving bug", that omission of the prior surveillance applications for Milano and Bianco was not intentional, but inadvertent, and that the omission did not require suppression of the incriminating tape recordings. As the district court noted, "At the time that she [the prosecutor] made her judgment, the requirements of subsection (1)(e) as applied to a roving intercept application had not been addressed in any reported decisions." Ferrara, 771 F.Supp. at 1316. The district court did not err in denying suppression because of a violation of subsection (1)(e).
 
 CONCLUSION
 
 136
 We hold that § 2518(11)(a) satisfies the particularity requirement of the fourth amendment; that the district court's order permitting surveillance with a "roving bug" was constitutional and valid; that the government's failure to disclose information about 34 Guild Street and prior surveillance applications did not require suppression of the recording of the LCN induction ceremony; and that the evidence seized at Failla's house was not taken in violation of his fourth-amendment rights.
 
 
 137
 We have considered and rejected all other arguments raised by the defendants, both as to their convictions and their sentences. We therefore affirm the judgments of the district court.