**UNITED STATES of America**

v.

**Aniello AMBROSIO, et al., Defendants.**

**No. 94 Cr. 674 (DC).**

United States District Court,
S.D. New York.

Sept. 1, 1995.

**180**

Ivan Fisher, New York City, for Aniello Ambrosio.[1]

Calogero Salemi, Otisville, N.Y., pro se.[2]

Mary Jo White, United States Attorney, Southern District of New York by Thomas M. Finnegan, Assistant United States Attorney, New York City, for plaintiff.

**1.** At a pre-trial conference on August 14, 1995, I granted Mr. Fisher's application to be relieved as counsel. Aniello Ambrosio is now represented by James Moriarty, Esq.

**2.** Although Salemi is represented in this case by counsel, he filed his present motions himself.

**3.** The warrant was later extended based on the affidavit of FBI Agent Thomas Uber dated March 12, 1993. Previously, Magistrate Judge Grubin had issued an order authorizing the installation and use of a pen register for a period of 60 days on Ray's Pizza Telephone # 1. The authorization was extended for three additional 60-day periods by other magistrate judges, and expired on March 19, 1993. Magistrate Judge Roberts

*OPINION*

CHIN, District Judge.

Defendant Aniello Ambrosio moves to suppress certain wiretap evidence and renews his motion for release on bail. For the reasons stated below, these motions are denied. Defendant Calogero Salemi moves *pro se* to dismiss the indictment and for release on bail. For the reasons stated below, his motions are denied.

### DISCUSSION

**I. *Ambrosio's Motion to Suppress Wiretap Evidence***

Aniello moves to suppress all evidence derived from two wiretaps that were placed on the telephones at his pizzeria, the Famous Original Ray's Pizza ("Ray's Pizza Telephones # 1 and # 2"). The warrant authorizing the wiretaps, issued by Judge McKenna, was based on the affidavit of FBI Agent Richard Demberger, dated February 9, 1993 (the "Demberger Affidavit").[3]

Ambrosio makes three arguments for the suppression of the wiretap evidence. First, he argues that the Affidavit did not contain sufficient facts to support a finding of probable cause that he was engaged in criminal activity. Second, he contends that the good faith exception to the exclusionary rule does not apply to wiretaps. Third, he argues that the affidavits omitted crucial information that would have persuaded Judge McKenna to deny the application for a warrant.

issued an order for a pen register for a period of 60 days on Ray's Pizza Telephone # 2. This authorization was extended to March 9, 1993 by Magistrate Judge Gershon. Pen registers simply indicate that a call was sent on, or received by, a particular phone line, and the length of the call. The substance of a given call cannot be determined by a pen register.

Additionally, Judge Wood signed an order authorizing the interception of Ambrosio's communications over a paging device leased to Ray's Pizza (the "Ray's Pizza Pager"). Monitoring on the Ray's Pizza Pager began on August 7, 1992 and terminated on September 6, 1992. Finally, other orders were issued by numerous judges authorizing the interception of communications over the other telephones cited in the Affidavit.

## A. Probable Cause

### 1. Standards

 Wiretap warrants are governed by 18 U.S.C. § 2510 *et seq.* (also referred to as "Title III"). Section 2518(3)(a-d) requires that before ordering the interception of wire communications, a judge must determine, based on the facts presented in an affidavit, that 1) there is probable cause to believe that an individual is committing, has committed, or is about to commit, a crime; 2) there is probable cause that communications about the crime will be obtained through the wiretap; 3) alternative means have failed or are too dangerous or unlikely to succeed; and 4) there is probable cause to believe that the premises to be wiretapped are being used for criminal purposes or are used or owned by the target of the wiretap. *See United States v. Wagner,* 989 F.2d 69, 71 (2d Cir.1993); *United States v. McGuinness,* 764 F.Supp. 888, 898 (S.D.N.Y.1991). Ambrosio argues only that the first element is lacking.

 Probable cause is established if the "totality of the circumstances" contained in the affidavit indicates a probability of criminal activity and that evidence of the criminal activity could be obtained through the use of electronic surveillance. *See United States v. Rowell,* 903 F.2d 899, 901–03 (2d Cir.1990); *cf. Beck v. Ohio,* 379 U.S. 89, 91, 85 S.Ct. 223, 224, 13 L.Ed.2d 142 (1964) (probable cause for arrest); *United States v. Ruggiero,* 824 F.Supp. 379, 398 (S.D.N.Y.1993), *aff'd,* 44 F.3d 1102 (2d Cir.1995). Thus, *prima facie* proof is not required; rather, only a probability of criminal activity needs to be established by the affidavit. *Wagner,* 989 F.2d at 72 (*quoting Illinois v. Gates,* 462 U.S. 213, 235, 103 S.Ct. 2317, 2330, 76 L.Ed.2d 527 (1983)).

 Affidavits made in support of a wiretap warrant must be read as a whole and construed in a "realistic and common-sense manner, so that [their] purpose is not frustrated." *United States v. Ruggiero,* 824 F.Supp. at 399 (*citing United States v. Harris,* 403 U.S. 573, 577–79, 91 S.Ct. 2075, 2079–80, 29 L.Ed.2d 723 (1971)); *accord United States v. Travisano,* 724 F.2d 341, 345–46 (2d Cir.1983). In addition, since wiretap orders are entitled to a presumption of validity, *see United States v. Fury,* 554 F.2d 522, 530 (2d Cir.1977), *cert. denied,* 436 U.S. 931, 98 S.Ct. 2831, 56 L.Ed.2d 776 (1978), substantial deference must be accorded to Judge McKenna's finding of probable cause. *Wagner,* 989 F.2d at 72; *United States v. Nersesian,* 824 F.2d 1294, 1305 (2d Cir.), *cert. denied,* 484 U.S. 958, 108 S.Ct. 357, 98 L.Ed.2d 382 (1987). As a reviewing court, I am limited to determining whether the issuing judge had a substantial basis for his finding. *Wagner,* 989 F.2d at 72 (*citing Illinois v. Gates,* 462 U.S. at 236, 103 S.Ct. at 2331). Any doubts as to the existence of probable cause should be resolved in favor of upholding the authorization. *Illinois v. Gates,* 462 U.S. at 237 n. 10, 103 S.Ct. at 2331 n. 10; *Ruggiero,* 824 F.Supp. at 399.

### 2. Probable Cause as to Aniello Ambrosio

 Ambrosio concedes that the government likely had probable cause to tap the Ray's Pizza telephones as a general matter. (Def.Mem. at 17). He argues, however, that the "tenor of the allegations against [him in the Demberger Affidavit] is amorphous and speculative" and that the government therefore did not have probable cause to suspect *him* of any criminal activity and to intercept *his* telephone conversations. (Def.Mem. at 12). Ambrosio minutely dissects the Affidavit and contends that each piece of information against him, taken alone, is insufficient to support a finding of probable cause. This approach, however, is flawed, for the allegations contained in a wiretap affidavit should be read as a whole and in a common-sense manner. *See United States v. Ruggiero,* 824 F.Supp. at 399. Keeping the above principles in mind and according substantial deference to Judge McKenna's order, I conclude that the Demberger Affidavit provides sufficient probable cause to suspect Ambrosio of engaging in criminal activity.

First, the affidavit charts 180 calls that were made to Ambrosio's cellular phone from the Ray's Pizza Telephones from September 9, 1992 to January 9, 1993, the same phones that had been used by Ray's Pizza employees to negotiate drug deals with a confidential

informant (the "CI").[4] (¶ 84, pp. 63–69). In addition, Ray's Pizza had been mentioned as a possible locale to complete a drug transaction. (¶ 57). Second, Salvatore Catalano, a Ray's Pizza employee, called Ray's Pizza twice from a restaurant called the Vita Caffe (where the CI negotiated for drugs with Matteo Gambino, a defendant in a related case) and asked to speak with a "Marcello," who, Demberger believed, is Ambrosio. When told that Marcello was not there, Catalano asked that Marcello call him back at least to say, "I don't have anything for you right now—I can't waste time with you." (¶ 37–38).

Third, on August 21, 1992, FBI surveillance agents saw Ambrosio travel to Taibi Import–Export, a warehouse owned by a known heroin trafficker, Vincent Pullazaro. (¶ 58 n. 13). Fourth, Ambrosio was seen at the Signora Social Club, which is operated by a Sandro Aiosa, a member of the "Sicilian Mafia" involved in heroin and cocaine trafficking. (¶ 89). The Social Club was also frequented by two persons convicted of distributing kilogram quantities of heroin to an FBI undercover agent. (Id.). In addition, two calls were made from the Ray's Pizza Telephones to a telephone listed in Aiosa's name.

Fifth, Ambrosio either traveled to or paid for others' trips to Italy, Colombia, and Albania. Demberger, based on his experience, identified those countries as either "known sources of heroin or commonly used [ ] routes for the importation of heroin into the United States." (¶ 78). Specifically, Ambrosio travelled to Baranquilla, Colombia on two occasions in June and July 1992 and made telephone calls to Ray's Pizza from his plane before and after each trip, as well as en route from the Miami International Airport. (¶¶ 95–96). Furthermore, at least two telephone calls were made between November 1992 and January 1993 from the Ray's Pizza Telephones to a telephone number listed to Antonio Jose Bojanini–Safdie residing in Barranquilla, Colombia. In 1986, Bojanini–

Safdie was the subject of a federal fugitive warrant issued in Florida in connection with the importation of about 30,000 pounds of marijuana from Colombia into the United States. (¶ 97). Ambrosio also paid for airline tickets for a G. Lazzari and a T. Carriera for travel from New York to Rome, Italy, with a stop in Albania. (¶ 101). Ambrosio also paid for a room at the JFK Holiday Inn the day that T. Carriera left for Rome. (Id.).

Finally, the Affidavit states that Catalano called Ray's Pizza from the Vita Caffe and spoke with Ambrosio concerning what Demberger believed to be a "narcotics transaction involving Ambrosio's source in Canada, who must be notified about whether a particular narcotics transaction will go forward." (¶ 104).

Thus, when read together in context and as a whole, and not dismantled in piece-meal fashion, these allegations support Judge McKenna's finding that probable cause existed to believe that Ambrosio was engaging in criminal activity.

■ Ambrosio makes several separate arguments concerning the sufficiency of the Affidavit. Each of these arguments is rejected. First, Ambrosio argues that the numerous calls to his cellular phone from the Ray's Pizza Telephones do not support a finding of probable cause because he is the owner of Ray's Pizza (a fact that was missing from the Affidavit) and thus would have a legitimate reason to call Ray's Pizza frequently. (Def.Mem. at 14, 17).[5] What Ambrosio does not recognize, however, is that his ownership of the pizzeria could support a probable cause finding: as Ambrosio concedes, the Demberger Affidavit contained sufficient information to believe that drug negotiations were taking place at Ray's Pizza and Ambrosio, as the owner of the pizzeria, could be presumed to have knowledge of the activities occurring there. Cf. United States v. Anderson, 881 F.2d 1128, 1141 (D.C.Cir.1989) (defendant's residence in apartment and pos-

---

4. The Demberger Affidavit relied primarily on information provided by the CI, who Demberger affirmed had furnished reliable information in the past. Ambrosio does not challenge the veracity of the CI's information.

5. The issue of whether Demberger should have included this fact in his Affidavit is discussed in Part I(C), infra.

session of keys to bedroom in which gun was located sufficient facts to justify inferring knowledge and constructive possession of gun); *United States v. Johnson,* 769 F.Supp. 389, 393 (D.D.C.1991) (residence in house on regular basis sufficient basis upon which to infer knowledge of drug activity in house), *aff'd,* 38 F.3d 609 (1994) (*citing United States v. Jenkins,* 928 F.2d 1175, 1179 (D.C.Cir. 1991)). In addition, the fact that information in the wiretap application may have an innocent explanation does not mean that the information cannot also support a finding of probable cause. *See United States v. Fama,* 758 F.2d 834, 838 (2d Cir.1985); *United States v. Ivkosic,* 700 F.2d 51, 57 (2d Cir. 1983) (fact that meeting among defendants, allegedly for bombing conspiracy, could be susceptible of "perfectly innocent" explanation does not defeat probable cause); *United States v. Gomez,* 758 F.Supp. 145, 149 (S.D.N.Y.1991).

Ambrosio next argues that Catalano's phone call on September 15, 1992, which Demberger believed involved a narcotics deal (¶ 104), cannot support a probable cause finding against him because there is nothing explicit in the conversation to indicate a drug transaction. I reject this argument because Judge McKenna was entirely justified in relying on Demberger's expert opinion in determining whether the Affidavit provided sufficient probable cause.[6] *See United States v. Benevento,* 836 F.2d 60, 71 (2d Cir.1987), *cert. denied,* 486 U.S. 1043, 108 S.Ct. 2035, 100 L.Ed.2d 620 (1988) (government agent's expert opinion is an "important factor" in probable cause determination); *United States v. Young,* 745 F.2d 733, 758 (2d Cir. 1984), *cert. denied,* 470 U.S. 1084, 105 S.Ct. 1842, 85 L.Ed.2d 142 (1985) (magistrate judge entitled to credit agent's "specialized knowledge" about practices of narcotics dealers). Ambrosio's argument that Demberger had no reason to conclude that Catalano was asking for Ambrosio when he called Ray's Pizza on November 11, 1992 and asked for

"Marcello" must fail for the same reason. In addition, Ambrosio himself states in his affidavit that he is also called "Marcello" or "Neil." (Ambrosio Affidavit, ¶ 1).

█ With respect to his visits to Vincent Pullazaro's warehouse and the Signora Social Club, Ambrosio is correct in arguing that his "mere association" with known drug traffickers cannot form the basis for a probable cause finding. *See Sibron v. State of New York,* 392 U.S. 40, 62, 88 S.Ct. 1889, 1902, 20 L.Ed.2d 917 (1968) (fact that defendant was seen talking to known drug addicts, by itself, is not sufficient probable cause to believe defendant was engaging in criminal activity); *United States v. Sanchez,* 1992 WL 315639, *1 (S.D.N.Y.1992) (*citing United States v. Almanzar,* 749 F.Supp. 538, 540 (S.D.N.Y. 1990)).[7] The Affidavit, however, does not rely simply on these associations but rather specifies other evidence against Ambrosio. Keeping in mind that the allegations in the Affidavit should be read in context, this argument is rejected.

Finally, it is true that "people other than criminals travel to Italy, Albania and Colombia." (Def.Mem. at 12). However, in addition to traveling to those countries, Ambrosio also worked with persons known to be engaging in drug transactions, frequented places patronized by known drug traffickers, and engaged in suspicious telephone calls. On this combination of facts, it was reasonable for Judge McKenna to find probable cause.

### 3. *Probable Cause as to Each Interceptee*

█ Even if the government did not have probable cause to suspect Ambrosio of engaging in criminal activity, his suppression motion must be denied because the government is not required to show probable cause with respect to *each* interceptee.

█ Neither the Fourth Amendment nor the wiretap statute requires the govern-

---

6. Demberger stated in his affidavit that he has been an agent of the FBI for fourteen years, has participated in numerous narcotics investigations, and has "personally participated" in the investigation of this case. (Demberger Affidavit, ¶ 4).

7. Ambrosio states in his affidavit that he had gone to the warehouse to purchase a marble top for his pizzeria. (Ambrosio Aff. at 5). Again, simply because an otherwise incriminating fact may also have an innocent explanation does not necessarily defeat probable cause.

ment to name all possible interceptees in a wiretap application. *See United States v. Donovan*, 429 U.S. 413, 427 n. 15, 97 S.Ct. 658, 668 n. 15, 50 L.Ed.2d 652 (1976) ("It is not a constitutional requirement that all those likely to be overheard engaging in incriminating conversations be named."); *United States v. McGuinness*, 764 F.Supp. 888, 900 (S.D.N.Y.1991); *United States v. Martin*, 599 F.2d 880, 884–85 (9th Cir.), cert. denied, 441 U.S. 962, 99 S.Ct. 2407, 60 L.Ed.2d 1067 (1979).[8] The Constitution only requires that the application identify "the telephone line to be tapped and the particular conversations to be seized." *United States v. Donovan*, 429 U.S. at 427 n. 15, 97 S.Ct. at 668 n. 15. Thus, even if the government did not have probable cause to suspect Ambrosio of criminal activity, because it had probable cause to monitor the Ray's Pizza telephones generally, it could also have monitored Ambrosio's calls over the Ray's Pizza telephones as long as the communications were likely to contain evidence of the criminal activity that was being investigated. *See United States v. McGuinness*, 764 F.Supp. at 900; *United States v. Martin*, 599 F.2d at 884–85. It would be anomalous to punish the government by suppressing the wiretap evidence for naming Ambrosio in the affidavit when it could constitutionally *not* have named him and still have intercepted his calls.

█ Like the Fourth Amendment, the wiretap statute does not require that every person whose conversations are intercepted must be named in the application before evidence obtained by the wiretap can be used against him. *See United States v. Hyde*, 574 F.2d 856, 862 (5th Cir.1978). Rather, the statute's conditions are satisfied as long as the affidavit names "an individual" for whom there is probable cause to suspect criminal activity. 18 U.S.C. § 2518(3)(a); *Vastola*, 670 F.Supp. at 1277; *Rodriguez*, 606 F.Supp. at 1370–71; *Martin*, 599 F.2d at 885.

█ Furthermore, both the Fourth Amendment and the wiretap statute require the government to name those individuals for whom it has probable cause. *United States v. Donovan*, 429 U.S. at 428, 97 S.Ct. at 668 ("We therefore conclude that a wiretap application must name an individual if the Government has probable cause to believe that the individual is engaged in the criminal activity under investigation and expects to intercept the individual's conversations over the target telephone."); *United States v. Chiarizio*, 525 F.2d 289, 292–93 (2d Cir.1975); 18 U.S.C. §§ 2518(1)(B)(iv), (4)(a). The government must name persons suspected of criminal activity so that, upon expiration of the warrant, they may be given notice that their conversations were intercepted and the opportunity to review the conversations, application and order. 18 U.S.C. § 2518(8)(d). Since nothing in the statute restricts the government from naming in the affidavit individuals as to whom it may not have probable cause, the statute's goal of providing notice is actually furthered by naming more, rather than fewer, persons. *See United States v. Martin*, 599 F.2d at 885; *United States v. Milan–Colon*, 1992 WL 236218, * 16 (S.D.N.Y.1992) (over-inclusion of persons in wiretap affidavit is not a cause for suppression but rather "furthers the policy of preventing unreasonable invasions of privacy" by ensuring that persons will be given notice of the order and intercepted communications).

█ Thus, contrary to Ambrosio's assertions, Judge McKenna did not have to find that there was probable cause that Ambrosio engaged in criminal activity to issue the warrant. Rather, the relevant inquiry is whether the conversations sought to be monitored were likely to contain evidence of a crime. *See United States v. McGuinness*, 764 F.Supp. at 900; *United States v. Domme*,

---

**8.** *See also United States v. Domme*, 753 F.2d 950, 953 n. 2 (11th Cir.1985); *United States v. Tehfe*, 722 F.2d 1114, 1118 (3d Cir.1983), cert. denied, 466 U.S. 904, 104 S.Ct. 1679, 80 L.Ed.2d 154 (1984); *United States v. Hyde*, 574 F.2d 856, 862 (5th Cir.1978); *United States v. Vastola*, 670 F.Supp. 1244, 1276–77 (D.N.J.1987); *United States v. Rodriguez*, 606 F.Supp. 1363, 1370–71

(D.Mass.1985). *But see United States v. Mosko*, 654 F.Supp. 402, 413 (D.Colo.1987) (noting that since defendant was not mentioned in the affidavit, it was not necessary to find probable cause as to him); *United States v. Errera*, 616 F.Supp. 1145, 1149 (D.Md.1985) ("a link between the individual, the telephone, and the offense must be established").

753 F.2d at 953 (required showing for issuance of wiretap warrant is sufficient information to believe that telephone in question is being used in an illegal operation). I find that they were.

The Affidavit clearly contained sufficient evidence for a probable cause finding that narcotics transactions were taking place and that communications with respect to those transactions would be transmitted over the Ray's Pizza telephones.[9] The affidavit recounted how Matteo Gambino sold 2–4 kilograms of heroin to the CI from April through July 1992. (¶ 26). The CI had negotiated for the drugs in three restaurants: Vita Caffe, Peppe's Pizza, and the Cafe Dion, and over telephones located in or near those restaurants. (¶¶ 24–26). On two occasions after the April 1992 sale of heroin, Gambino told the CI that he expected to meet with his supplier and was seen meeting with Giuseppe Troia (a defendant in a related case). Gambino had informed the CI that he had access to 2–4 kilograms of heroin coming in from Italy every week. (¶ 24).

At the end of May 1992 and the beginning of June 1992, several calls were made from the Vita Caffe to Ray's Pizza Telephone # 1. (¶ 27). The calls coincided with Gambino's deliveries of two heroin samples to the CI. (*Id.*). After the first sample was provided to the CI on May 30, 1992, Gambino told the CI that he would call his source to obtain the price for the heroin. Within the next twenty minutes, two calls were made from the Vita Caffe pay telephone to Ray's Pizza Telephone # 1. A call was made later from the Vita Caffe to Ray's Pizza Pager. The next day, Gambino provided the price of the heroin to the CI. (*Id.*).

On June 16, 1992, the CI met with Gambino at Peppe's Pizza to discuss a shortage on the June 2 delivery and asked Gambino to call his supplier to correct the shortage. In the CI's presence, Gambino made three calls; pen register information revealed that all three calls were to Ray's Pizza Pager. When the calls were returned, Gambino (whose side of the conversation was recorded by the CI) told the caller that the "car" that he had

given his friend two weeks before had been "hit a little." Demberger stated in his affidavit that, based on his experience and the investigation, he believed the word "car" referred to heroin and the phrase "hit a little" was a coded reference to the shortage. (¶ 29).

During the latter part of June, several calls were placed to the Ray's Pizza Pager which coincided with heroin negotiations between the CI and Gambino. (¶ 30). Between May 29, 1992 and June 30, 1992, 42 calls were made either to or from Ray's Pizza Telephone # 1 and Ray's Pizza Pager from the phones near where the CI negotiated for heroin with Gambino. (¶ 32).

From November 1992 to December 1992, the CI negotiated for heroin with Salvatore Catalano, a pizza man at Ray's Pizza, whom he had met through Francesco Stabile (a defendant in a related case). (¶¶ 33, 42). On November 19, 1992, the CI met with both Catalano and Stabile to discuss the CI's purchase of more heroin. Catalano agreed to call the CI the next day to set up the time and place for the deal. (¶ 42). On November 20, 1992, Catalano called the Vita Caffe pay telephone from Ray's Pizza Telephone # 2 and asked for Gambino's number. He later called Gambino, again from Ray's Pizza Telephone # 2. Finally, Catalano called the CI collect and arranged to meet him a few days later. (¶ 46).

On November 24, 1992, the CI met with Catalano, who told the CI that the CI was suspected of being a "sbirro" (Italian for rat or stool pigeon), and a cop. The CI told Catalano that he could not close the deal until the following week. (¶ 50). The next week, the CI called Ray's Pizza Telephone # 1 and spoke with Catalano. This conversation was recorded by the CI. During the conversation, the CI, who apparently was away, tells Catalano that "it's good for us, for you and for me. Understand? I can't explain it to you over the telephone." Catalano tells the CI that he asked "those people to wait for you so that we can start to get going." (¶ 55).

---

**9.** I will not attempt to repeat all of the evidence contained in the Demberger Affidavit, but will simply highlight the most salient points with respect to the Ray's Pizza telephones.

On December 4, 1992, the CI met with Catalano at Ray's Pizza. Catalano told the CI that he expected to have a sample of better quality heroin in a few days and that he wanted to do the deal at Ray's Pizza, possibly in the basement. (¶ 57). The CI next met with Catalano on December 7, 1992 at Ray's Pizza, after having first set up the meeting with Catalano over Ray's Pizza Telephone # 1. (¶¶ 61, 62). The CI told Catalano he would call him the next night to give him the time and place to finish the heroin deal.

On December 8, 1992, the CI called Ray's Pizza Telephone # 1 and spoke with Catalano; they agreed to meet the next day. (¶ 64). The heroin sale did not take place the next day because Catalano could not get in touch with someone. (¶ 67). The CI then spoke with Catalano two times over Ray's Pizza Telephone # 1 on December 11, 1992 and then met with him on December 13 at Ray's Pizza, and told Catalano that he was going on vacation. On January 12, 1993, the CI went to Ray's Pizza and was told that Catalano no longer worked there.

In addition, the Demberger Affidavit detailed numerous calls made from the Ray's Pizza Telephones to Gambino's pager, Troia's pager, to and from the Vita Caffe Telephone and the Peppe Pizza telephone. Additionally, the affidavit notes 193 calls made from the Ray's Pizza Telephones to Italy from November 2, 1992 to January 8, 1993, 6 calls to Colombia, 6 calls to Venezuela, 2 to Albania, and 22 to Canada. (¶¶ 92–102). Again, these countries were identified as either "known sources of heroin or commonly used [ ] routes for the importation of heroin into the United States." (¶ 78).

Based on all of the above, it is clear that the Demberger Affidavit provided more than adequate probable cause to believe that the Ray's Pizza Telephones were being used to advance drug trafficking and to support Judge McKenna's issuance of the warrant.

**10.** The procedures to obtain suppression of wiretap evidence are embodied in § 2518(10)(a), which provides in relevant part:

## B. *Good Faith Exception*

Finally, the government asserts that even if probable cause to wiretap the Ray's Pizza Telephones was lacking, the wiretap evidence should not be suppressed because the federal agents who taped the conversations relied in good faith on the sufficiency of the wiretap warrant. Ambrosio argues that the good faith exception to the exclusionary rule does not apply to wiretap warrants and that execution of the warrant in reliance on Judge McKenna's order violated the wiretap statute.

The Fourth Amendment provides that no search and seizure shall take place except upon a warrant based on probable cause. *See Weeks v. United States,* 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914). To deter law enforcement officers from executing unconstitutional searches and seizures, the exclusionary rule was created, which requires the suppression of evidence obtained without probable cause. *Weeks v. United States,* 232 U.S. at 389–91, 34 S.Ct. at 343–44. In *United States v. Leon,* 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), the Supreme Court narrowed the scope of the exclusionary rule and enunciated a "good faith" exception to the rule: evidence obtained pursuant to a search warrant that was later found to be invalid (*e.g.,* probable cause was lacking) would not have to be suppressed if the officer reasonably relied in good faith on the validity of the warrant. The Court reasoned that the exclusionary rule's goal of deterrence would not be furthered by penalizing officers who had complied with Fourth Amendment requirements. *Id.* at 918–921, 104 S.Ct. at 3418–19.

The wiretap statute has its own exclusionary remedy for wiretap evidence seized in violation of the statute. Section 2515 provides:

> Whenever any wire or oral communication has been intercepted, no part of the contents of such communication and no evidence derived therefrom may be received in evidence in any trial ... if the disclosure of that information would be in violation of this chapter.[10]

> (a) Any aggrieved person in any trial ... may move to suppress the contents of any wire or oral communication intercepted pursuant to

There is some conflict among courts that have considered the issue as to whether the good faith exception should apply to wiretap warrants. While most courts apply *Leon's* good faith exception to wiretaps,[11] some courts have refused to do so. *See, e.g., United States v. Orozco,* 630 F.Supp. 1418, 1521 (S.D.Cal.1986); *United States v. Ward,* 808 F.Supp. 803, 807 (S.D.Ga.1992); *see also United States v. McGuinness,* 764 F.Supp. 888, 897 n. 2 (S.D.N.Y.1991); *United States v. Orena,* 883 F.Supp. 849, 860 n. 7 (E.D.N.Y. 1995) (noting conflict among courts). Those courts that do not apply *Leon's* good faith exception to wiretap warrants construe the suppression section as the exclusive remedy for violations of the statute. *See, e.g., Orozco,* 630 F.Supp. at 1521–22 (noting that Congress had not (at that time) attempted to modify section 2515's suppression requirement pursuant to *Leon,* the court stated that there was no "congressional indication that the statutory suppression remedy should be limited by the good faith exception" and that it "does not view the exclusionary rule and 18 U.S.C. § 2515 as providing interchangeable remedial sources."); *McGuinness,* 764 F.Supp. at 897 n. 2 ("It is doubtful, however, whether the *Leon* exception applies to wiretaps, since the exclusionary rule for wiretaps is explicitly commanded by statute.").

Courts that do apply the good faith exception have enunciated numerous reasons for applying the exception. *See, e.g., United States v. Moore,* 41 F.3d at 376 (*Leon* applies to suppression of wiretap evidence because the legislative history expresses a clear intent to adopt suppression principles); *United States v. Malekzadeh,* 855 F.2d at 1497

(equating *Leon's* good faith exception to a *Franks* analysis, which applies to wiretaps and which also considers whether information missing from an affidavit was the result of a good faith mistake). For the reasons stated by these courts, and for other reasons as well, I agree that *Leon's* good faith exception should apply to the wiretap warrants at issue in this case.

▮▮▮ First, in enacting the wiretap statute, Congress clearly intended for the statute to be applied consistently with constitutional requirements. *See United States v. Bianco,* 998 F.2d 1112, 1126 (2d Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1644, 128 L.Ed.2d 364 (1994) (Congress did not intend for the wiretap statute "to press the scope of the suppression role beyond [then] present search and seizure law") (*quoting* S.Rep. No. 1097, 90th Cong., 2d Sess. 96 (1968), *reprinted in* 1968 U.S.C.C.A.N. 2112, 2185); *United States v. Moore,* 41 F.3d at 376. In 1984, search and seizure law was modified by the Supreme Court in *Leon.* Congress, in an effort to keep the wiretap statute in line with the new developments in Fourth Amendment law, amended subsection 2518(10) in 1986 to add a paragraph limiting the statute's remedies and sanctions to nonconstitutional violations of the chapter, so that in the event a violation of constitutional magnitude occurs, "the court involved in a subsequent trial will apply *the existing Constitutional law with respect to the exclusionary rule."* S.Rep. 99–541, 99th Cong., 2d Sess.1986 (1986), *reprinted in* 1986 U.S.C.C.A.N. 3555, 3577 (emphasis added); 18 U.S.C. § 2518(10)(c).[12] Probable cause is a constitutional require-

---

this chapter, or evidence derived therefrom, on the grounds that—
(i) the communication was unlawfully intercepted; ...
If the motion is granted, the contents of the intercepted wire or oral communication, or evidence derived therefrom, shall be treated as having been obtained in violation of this chapter.

**11.** *See United States v. Moore,* 41 F.3d 370, 376 (8th Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1985, 131 L.Ed.2d 872 (1995); *United States v. Malekzadeh,* 855 F.2d 1492, 1497 (11th Cir.1988), *cert. denied,* 489 U.S. 1024, 109 S.Ct. 1149, 103 L.Ed.2d 209 (1989); *United States v. Milan–Colon,* 1992 WL 236218, \* 22, 24

(S.D.N.Y.1992); *United States v. Gambino,* 741 F.Supp. 412, 414–15 (S.D.N.Y.1990).

**12.** (c) The remedies and sanctions described in this chapter with respect to the interception of electronic communications are the only judicial remedies and sanctions for nonconstitutional violations of this chapter involving such communications.

Prior to the amendment, both constitutional and nonconstitutional violations of the statute were subject to the suppression remedy set forth in subsection 2515. *See United States v. Giordano,* 416 U.S. 505, 94 S.Ct. 1820, 40 L.Ed.2d 341 (1974). Subsection 2518(10)(c) was added on October 21, 1986.

ment that has been incorporated into Title III. *See* S.Rep. 90–1097, 90th Cong., 2d Sess.1968 (1968), *reprinted in* 1968 U.S.C.C.A.N. 2112 (legislative history reveals that Congress intended Title III to adopt constitutional requirements of a warrant and probable cause); *Giordano,* 416 U.S. at 526, 94 S.Ct. at 1831 (section 2518(10)(a)'s reference to communications "unlawfully intercepted" must incorporate some constitutional violations including, for example, lack of probable cause); *Zagarino v. West,* 422 F.Supp. 812, 819 (E.D.N.Y.1976) (probable cause is a Fourth Amendment policy implemented by Congress in Title III). Thus, when wiretap evidence is challenged because it was obtained pursuant to a warrant that lacked probable cause, a reviewing court is not limited to the statute's suppression remedy but may also look to *Leon's* good faith exception to the exclusionary rule. *See* 18 U.S.C. § 2518(10)(c).

*United States v. Spadaccino,* 800 F.2d 292 (2d Cir.1986), does not require a different result. The *Spadaccino* court interpreted a Connecticut state wiretap law and held that the judicially crafted "good faith exception" to the exclusionary rule did not apply since suppression in that case was "mandated" by the Connecticut statute. *Id.* at 296. As noted above, the federal wiretap statute does not "mandate" suppression for constitutional violations and, accordingly, the *Spadaccino* court's refusal to apply *Leon* to the Connecticut law is inapplicable to this case.

 Second, courts have almost unanimously agreed that affidavits made in support of a wiretap application may be subject to a good faith analysis pursuant to *Franks v. Delaware,* 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978). In *Franks,* the Supreme Court held that a facially sufficient search warrant could be invalid and evidence suppressed if the affidavit in support of the warrant contained materially false or misleading allegations. A defendant challenging the veracity of an affidavit must show deliberate falsity or reckless disregard; allegations of innocent mistake or negligence are insufficient. *Id.* at 171, 98 S.Ct. at 2684. In other words, evidence seized pursuant to a search warrant that was based on a misleading or incomplete affidavit will not be suppressed if the affiant acted in good faith. Thus, *Leon's* good faith analysis is an integral part of a *Franks* analysis. *See United States v. Leon,* 468 U.S. 897, 923, 926, 104 S.Ct. 3405, 3421, 3422, 82 L.Ed.2d 677 (1984) (holding that only reckless or deliberate police conduct will trigger suppression).

Title III requires that each application for a wiretap order be based on an affidavit which "shall include ... a full and complete statement of the facts and circumstances relied upon by the applicant, to justify his belief that an order should be issued." 18 U.S.C. § 2518(1)(b). This section, like the probable cause requirement, is subject to Title III's suppression remedy, § 2515.[13] Notwithstanding the affidavit requirement and exclusionary provision, however, courts, including the Second Circuit, have almost unanimously applied *Franks* to evidence obtained by electronic surveillance.[14]

*United States v. Bianco,* 998 F.2d 1112 (2d Cir.1993), is instructive. The defendants in that case moved to suppress evidence obtained by a roving bug because the affidavit in support of the wiretap application failed either to specify the place where the communications would be intercepted or to state why such specification was not practical, in violation of the roving-intercept provision of the wiretap statute. The district court refused to suppress the evidence, holding that although the government failed to disclose these facts, the affiant had acted in good

---

**13.** Ambrosio also moves for suppression pursuant to *Franks,* claiming that Demberger omitted material facts from his affidavit. This argument will be considered in Part I(C), below.

**14.** *See, e.g., United States v. Meling,* 47 F.3d 1546, 1553 (9th Cir.1995); *United States v. Falls,* 34 F.3d 674, 681 (8th Cir.1994); *United States v. Lucht,* 18 F.3d 541, 546 (8th Cir.), *cert. denied* ⸺ U.S. ⸺, 115 S.Ct. 363, 130 L.Ed.2d 316 (1994); *United States v. Collins,* 972 F.2d 1385, 1410 (5th Cir.1992); *United States v. Bianco,* 998 F.2d 1112 (2d Cir.1993); *United States v. Tham,* 960 F.2d 1391, 1395 (9th Cir.1991); *United States v. Hines,* 717 F.2d 1481, 1485 (4th Cir.1983), *cert. denied,* 467 U.S. 1214, 104 S.Ct. 2656, 81 L.Ed.2d 363 (1984); *United States v. Southard,* 700 F.2d 1, 7–8 (1st Cir.), *cert. denied,* 464 U.S. 823, 104 S.Ct. 89, 78 L.Ed.2d 97 (1983).

faith. The Second Circuit, in affirming the district court's decision, declined to look directly to the exclusionary rule of the statute. Rather, the court explained that, notwithstanding Title III's suppression provision, a *Franks* analysis was appropriate in the wiretap context because the purposes of § 2515, to "protect the privacy of communications [and] to ensure that the courts do not become partners to illegal conduct," are consistent with the *Franks* standard of good faith. *Id.* at 1126.

Thus, since the *Franks* standard of good faith is applicable to an affidavit made in support of a wiretap application, even in light of the statute's exclusionary rule, the good faith exception to the probable cause requirement, as set forth in *Leon,* should also apply to wiretap warrants.

▮▮▮▮ Under the good faith doctrine enunciated in *Leon,* suppression of evidence is proper only if: 1) the issuing judge abandoned his detached, neutral role; 2) the agent was dishonest or reckless in preparing the affidavit supporting the issuance of the wiretap order; or 3) the agent's reliance on the warrant was not objectively reasonable. *United States v. Leon,* 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984). Ambrosio does not argue that Judge McKenna abandoned his detached, neutral role or that any agent's reliance on the warrant was not objectively reasonable, leaving only the issue of whether Demberger was dishonest or reckless in preparing his affidavit. As discussed in greater detail below, Ambrosio presents absolutely no evidence of any dishonesty or recklessness on Demberger's part, nor does he provide any evidence even to infer such dishonesty or recklessness. Accordingly, I hold that the agents acted in good faith on the sufficiency of Judge McKenna's wiretap warrant when they intercepted Ambrosio's communications over the Ray's Pizza telephones. Suppression is therefore not appropriate and the motion must be denied.

### C. *Franks v. Delaware*

Ambrosio argues that even if the Demberger Affidavit presented sufficient probable cause, it was only because Demberger omitted certain crucial information which, if in-

cluded, would have negated any probable cause as to him. Specifically, Ambrosio contends that if Judge McKenna had been advised that Ambrosio owned Ray's Pizza and thus had an innocent reason to be called so frequently from the Ray's Pizza Telephones, the Judge would not have issued the wiretap warrant.

▮▮▮▮ Pursuant to *Franks v. Delaware, supra,* an affidavit in support of a wiretap application may be challenged and evidence suppressed if the defendant can make a substantial preliminary showing that the affiant either deliberately, or with reckless disregard, submitted an affidavit omitting material facts. *See Rivera v. United States,* 928 F.2d 592, 604 (2d Cir.1991) ("Intentional or reckless omissions of material information . . . may serve as the basis for a *Franks* challenge.") (*citing United States v. Campino,* 890 F.2d 588, 592 (2d Cir.1989), *cert. denied,* 494 U.S. 1068, 110 S.Ct. 1787, 108 L.Ed.2d 788 (1990)). Material facts are those that are necessary to the finding of probable cause. *Franks v. Delaware,* 438 U.S. at 155–56, 98 S.Ct. 2674. Reckless disregard may be inferred where the omitted information was "clearly critical to the probable cause determination." *Rivera,* 928 F.2d at 604.

▮▮▮▮ Assuming that the government was obligated to show probable cause with respect to Ambrosio (which, as I have held above, it was not), his *Franks* argument must still fail because he did not show that the omission was necessary to a finding of probable cause. *See United States v. Martinez,* 869 F.Supp. 202, 208 (S.D.N.Y.1994). The affidavit contained other information about Ambrosio, including suspicious telephone calls with Catalano, travel to countries known for drug trafficking and association with known drug traffickers, which was sufficient to support a probable cause finding against him. Furthermore, as noted above, the fact that Ambrosio owned Ray's Pizza could support, not negate, a finding of probable cause: Ambrosio concedes that there was evidence that drug conspiracy conversations took place over the Ray's Pizza Telephones and Ambrosio, as the owner of the pizzeria, could

be deemed to have knowledge of the events occurring at his establishment. Finally, Ambrosio does not allege that Demberger knew or should have known of Ambrosio's ownership, nor does he allege any outrageous conduct with respect to the omission of this fact to infer that it was done deliberately or recklessly. *Cf. Golino v. City of New Haven,* 950 F.2d 864, 871–72 (2d Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 3032, 120 L.Ed.2d 902 (1992) (reckless disregard could be inferred in murder case where police omitted from application for arrest warrant the fact that suspect weighed at least 50 pounds more than killer, that prime accuser made inconsistent statements, and that killer's fingerprints did not match those of suspect); *United States v. Reivich,* 793 F.2d 957, 961 (8th Cir.1986) (noting that courts "generally have relied also on additional circumstances in support of their findings of recklessness"); *United States v. Davis,* 617 F.2d 677, 694 (D.C.Cir.1979), *cert. denied,* 445 U.S. 967, 100 S.Ct. 1659, 64 L.Ed.2d 244 (1980) (recklessness should be inferred from omission of information only when result of "flagrant police actions").

Thus, because the Demberger Affidavit was sufficient to establish probable cause without the omitted information and because there is no reason to believe that the omitted information, if included, would have cast doubt on the existence of probable cause, Ambrosio's request for a *Franks* hearing and his motion to suppress are denied.

## II. *Ambrosio's Motion for Release on Bail*

On March 30, 1995, I denied defendant Aniello Ambrosio's motion to be released on bail pending the trial of this case because he presents an unacceptable risk of flight and a danger to the community. In his motion, Ambrosio argued that the wiretap evidence against him was obtained illegally. I rejected that argument as premature because Ambrosio had not moved to suppress the evidence. Ambrosio appealed my decision, which was affirmed on May 11, 1995.

Ambrosio now renews his application for release on bail, asserting that without the wiretap evidence, the government's case against him is weak. Since I have denied his suppression motion for the reasons stated above, his renewed motion for bail must also be denied.

## III. *Salemi's Motion to Dismiss the Indictment*

Salemi moves *pro se* to dismiss the indictment against him for infractions of the grand jury process and for release from custody because of Speedy Trial Act violations.[15] With respect to the grand jury, Salemi specifically contends that 1) the grand jury that indicted him was not a fair cross-section of the community, and 2) the indictment is fatally defective because it was not reviewed by the grand jury and was not signed or returned in open court.

### A. *Grand Jury*

#### 1. *Fair Cross Section*

 Salemi contends that the methods used to select grand juries in the Southern District of New York are unconstitutional because the jury panels do not represent a fair cross-section of the population. He cites a November 1994 radio broadcast on National Public Radio that reported that qualified citizens of African American and Hispanic descent from New York and Bronx counties were allegedly being systematically excluded from the jury selection process in violation of the Fifth and Sixth Amendments and the Jury Selection and Service Act, 28 U.S.C. § 1861 *et seq.*

The Sixth Amendment requires that jury panels be drawn from sources representing a "fair cross section of the community" in which the defendant is being tried. *Taylor v. Louisiana,* 419 U.S. 522, 538, 95 S.Ct. 692, 701, 42 L.Ed.2d 690 (1975); *United States v. Jackman* 46 F.3d 1240, 1244 (2d Cir.1995). The Jury Selection and Service Act similarly requires that grand juries in federal courts be selected at random from a fair cross section of the community in the district where the court convenes. 28 U.S.C. § 1861.

Salemi relies on two cases in support of his claim that the process of selecting the grand

---

15. Salemi actually made three separate motions, but they will be considered together.

jury panel in his case violated the Sixth Amendment: *United States v. Jackman,* 46 F.3d 1240 (2d Cir.1995), and *United States v. Osorio,* 801 F.Supp. 966 (D.Conn.1992). These cases, however, are inapplicable; both concerned the jury pool selection process for the district of Connecticut which, because of computer and human error, almost completely excluded minority residents.[16]

The grand jury selection process at issue in this case, of course, is that for the Southern District of New York, which process was analyzed by the Second Circuit in *United States v. Biaggi,* 909 F.2d 662 (2d Cir.1990), *cert. denied,* 499 U.S. 904, 111 S.Ct. 1102, 113 L.Ed.2d 213 (1991). One of the defendants in *Biaggi,* John Mariotta, argued that the process used in the Southern District, *i.e.,* exclusive use of voter registration lists, unlawfully discriminated against blacks and Hispanics and violated his Fifth and Sixth Amendment rights. In *Biaggi,* based on 1984 census figures, blacks were underrepresented in the jury pool by 3.6 percentage points and Hispanics by 4.7 percentage points.

The Second Circuit summarily affirmed the dismissal of Mariotta's Fifth Amendment Equal Protection claim, declaring that use of voter registration lists as the sole source of prospective jurors was a "race neutral" procedure. *Id.* at 677. The Sixth Amendment argument was more troublesome, and the court stated that it would find the issue "extremely close if the underrepresentations had resulted from any circumstance less benign than use of voter registration lists." *Id.* at 678. Nevertheless, the court affirmed the district court's denial of Mariotta's Sixth Amendment claim, since the degree of underrepresentation, or the number of minority residents who would have to be added to the pool to make it an exactly fair cross-section, was not so great as to amount to a violation of the cross-section requirement. *Id.*

Here, Salemi relies only on a radio broadcast that purportedly reported that there was underrepresentation that had resulted from "circumstances less benign than use of voter registration lists." Salemi has provided no admissible evidence to support his allegations. Furthermore, Salemi does not specify what unconstitutional procedures were used to select the jury panel. In light of the Second Circuit's seal of approval of the exclusive use of voter registration lists in *Biaggi,* and in view of the complete lack of evidentiary support for his contentions, Salemi's motion must be denied.

### 2. *The Indictment*

Salemi moves for permission to inspect the grand jury minutes and for dismissal of the indictment because, allegedly, the grand jury did not review the indictment or pass upon it, and because the indictment was not duly returned in open court upon the oath of the grand jury foreperson. I have reviewed the original indictment which was in fact signed by the grand jury foreperson, who had been sworn. The government suggests that Salemi's confusion may be the result of his having received a copy of the indictment that was not signed during discovery. At any rate, the indictment was signed and sworn to, and Salemi does not provide any basis for his allegations that the indictment is defective. Accordingly, his motion is denied.

### B. *Speedy Trial Act*

Finally, Salemi moves for release on bail pursuant to the Speedy Trial Act, 18 U.S.C.

---

**16.** In *Osorio,* the jury pool selection process began with the selection of ten percent of the names on voter registration lists. Those persons were sent jury questionnaires; the prospective jurors who returned the questionnaires and were rated qualified would be placed in a wheel to become the source of the jury pool for grand and petit jury panels called for service. This process produced significant anomalies: although 11.41% of the voting-age population in the community was either black or hispanic, those minorities accounted for only 3.85% of the individuals in the qualified wheel. This occurred because no jury questionnaire had been sent to residents of Hartford and New Britain, both of which contain significant minority populations. Thus, the *Osorio* court granted defendant's motion to dismiss the indictment because the exclusion of Hartford and New Britain residents from the jury panel created a pool that was not a fair cross-section of the community.

The Second Circuit reviewed the jury selection process in *Jackman,* and found that the unconstitutional pre–*Osorio* procedure was still being used in substantial part. The appeals court therefore reversed Jackman's conviction and ordered a new trial.

§ 3164(c). The Speedy Trial Act provides that "[t]he trial of any person [being held in detention awaiting trial] shall commence not later than ninety days following the beginning of such continuous detention," and that "[n]o detainee ... shall be held in custody pending trial after the expiration of such ninety-day period required for the commencement of his trial." 18 U.S.C. §§ 3164(b) and (c). A defendant will not automatically be released if trial does not commence within 90 calendar days from the indictment, however, because the Act also provides that "periods of delay enumerated in section 3161(h) are excluded in computing the time limitation specified in this section." 18 U.S.C. § 3164(b).

 Section 3161(h) lists several circumstances for which time will be excluded from the 90 day computation, including delay intended to serve the ends of justice. 18 U.S.C. §§ 3161(h)(1)(F) and (8)(A). This is a 17–defendant, tri-lingual case involving copious amounts of discovery and consequently, I have granted several continuances, both at the government's and the defendants' requests, to provide the parties enough time to review discovery, consider plea agreements, and submit motions, all to serve the ends of justice. The government has calculated that, in the worse-case scenario, 54 days remain on the Speedy Trial clock. Accordingly, Salemi's motion is denied.[17]

### CONCLUSION

Defendant Ambrosio's motion to suppress the wiretap evidence is denied. His motion for release on bail is also denied. Defendant Salemi's motions to dismiss the indictment and for release are denied.

SO ORDERED.

---

17. Salemi contends that "the record of this instant matter is void of any indication of any waiver of Defendant's interest in such speedy trial rights aforesaid." In actuality, Salemi's counsel represented Salemi at each of the pretrial conferences held in this case and did not object to my excluding time from Speedy Trial Act calculations.