UNITED STATES of America

v.

**Rosario GANGI, et al., Defendants.**

**No. 97 CR. 1215(DC).**

United States District Court, S.D. New York.

Jan. 14, 1999.

As Amended Jan. 27, 1999.

Order Denying Reconsideration, Jan. 30, 1999.

---

304

Mary Jo White, U.S. Attorney for the Southern District of New York by Celeste L. Koeleveld, Douglas M. Lankler, Jason Sabot,

Assistant U.S. Attorneys, New York City, for U.S.

Joseph Tacopina, New York City, for Defendant Rosario Gangi.

Mathew J. Mari, New York City, for Defendant Frank Lino.

J. Brian Hansbury, Purchase, Anthony J. Siano, White Plains, NY, for Defendant Ernest Montevecchi.

Frank A. Lopez, New York City, for Defendant John Cerasani.

Roberto D. Stanziale, Ft. Lauderdale, FL, for Defendant Claudio Iodice.

Murray & McCann by Francis J. Murray, New York City, for Defendant Irwin Schneider.

Douglas E. Grover, New York City, Vincent Gelardi, White Plains, NY, for Defendant Robert Schwikrath.

White & Case by James J. McGuire, Thomas M. Mullaney, New York City, for Defendant Gordon Hall.

Thomas J. Marlowe, Thomas M. Connelly, Phoenix, AZ, for Defendant Joe Kirkham.

Morrison & Foerster LLP * by Howard E. Heiss, Jamie A. Levitt, New York City, for Defendants Lawrence Schneider and Arnold Schneider.

Michael Macklowitz, Jeffrey S. Shupack, New York City, for Defendant Sal Taddeo.

Barry S. Turner, New York City, for Defendant Michael Motsykulashvili.

Aronne & Dipietro by James J. Dipietro, Brooklyn, NY, for Defendant Thomas Scarpaci.

Joseph Sorrentino, Staten Island, NY, for Defendant Phil Defonte.

## AMENDED MEMORANDUM DECISION

CHIN, District Judge.

In this RICO and securities fraud case, several defendants move to suppress wiretap evidence. For the reasons set forth below, the motions are denied, except that the request to suppress recordings intercepted by the government after the period of authorization had expired for two of the wiretaps is granted.

## BACKGROUND

The superseding indictment in this case charges the defendants with engaging in a scheme to defraud investors by manipulating the market price of stocks for several companies. The government alleges, among other things, that defendants, including alleged members and associates of organized crime families, arranged to artificially inflate the price of stock through deceptive practices and threats of violence.

The wiretap evidence in this case was obtained from wiretaps on cellular telephones used by defendants Eugene Lombardo, Rosario Gangi, and Ernest Montevecchi. On December 30, 1996, based on the affidavit of FBI Special Agent Stephen B. Hessinger, Judge Barbara S. Jones issued an order authorizing a wiretap, for a period of 30 days, on defendant Eugene Lombardo's cellular telephone ("Lombardo I"). The authorization was extended for three additional 30–day periods ("Lombardo II, III, and IV") by Judge Kevin Thomas Duffy.

On April 16, 1997, Lombardo began using a different cellphone and accordingly monitoring of Lombardo's first cellphone ceased. On April 24, 1997, Judge Duffy authorized the wiretapping of Lombardo's new cellphone for a period of 30 days ("Lombardo V"). He later extended the authorization for six additional 30–day periods ("Lombardo VI—XI").

Judge Duffy also authorized a wiretap on defendant Montevecchi's cellphone for a period of 30 days ("Montevecchi I"), which he extended for three additional 30–day periods ("Montevecchi II—IV"). Finally, Judge Duffy authorized a wiretap for a period of 30 days on a cellphone used by Gangi ("Gangi I"). Gangi later changed cellphones and

Judge Duffy authorized a wiretap on his new cellphone ("Gangi II").

## DISCUSSION

The procedures governing the authorization of wiretaps are set out in 18 U.S.C. § 2518. Section 2518(3) requires a judge, before authorizing the interception of wire communications, to determine that (a) there is probable cause for belief that a crime has been, is being, or is about to be committed; (2) there is probable cause for belief that particular communications concerning the crime will be obtained through the wiretapping; (3) normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed or to be too dangerous; and (4) there is probable cause for belief that the phones to be wiretapped are being used for criminal purposes or by the target of the wiretap. *See also United States v. Wagner*, 989 F.2d 69, 71 (2d Cir. 1993); *United States v. Ambrosio*, 898 F.Supp. 177, 180 (S.D.N.Y.1995); *United States v. McGuinness*, 764 F.Supp. 888, 898 (S.D.N.Y.1991).

Defendants make several arguments for the suppression of the wiretap evidence in this case: (1) the Hessinger affidavit, which was used in the application for Lombardo I and incorporated in later requests for authorizations, did not contain sufficient facts to support a finding of probable cause that the defendants were engaged in criminal activity; (2) the government failed to meet the requirement that court-ordered electronic surveillance be conducted in a way to minimize the interception of communications not otherwise subject to interception, as set forth in 18 U.S.C. § 2518(5); (3) during certain of the periods in question agents monitored for more time than the authorization order allowed; and (4) the government, without adequate excuse, failed to obtain the sealing of recordings of electronic surveillance in a

timely fashion.[1] I will address each of defendants' contentions in turn.

### 1. Probable Cause

■ Probable cause to authorize a wiretap "is established if the 'totality of the circumstances' contained in the affidavit indicates a probability of criminal activity and that evidence of the criminal activity could be obtained through the use of electronic surveillance." *Ambrosio*, 898 F.Supp. at 181. The issuing officer must "make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him [or her], including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is fair probability that ... evidence of a crime will be found." *Illinois v. Gates*, 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983).

■ Additionally, the issuing judicial officer's decision to authorize wiretaps "should be paid great deference by reviewing courts." *Spinelli v. United States*, 393 U.S. 410, 419, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969). Thus, any doubt as to the existence of probable cause should be resolved in favor of upholding the authorization. *Gates*, 462 U.S. at 237, 103 S.Ct. 2317.

■ In authorizing Lombardo I, Judge Jones found that the Hessinger affidavit provided probable cause to believe that the targets of the wiretap (Gangi, Lombardo, Montevecchi, Irwin Schneider and Claudio Iodice (the "target defendants"))[2] were engaging in criminal activities including racketeering, wire fraud, money laundering, extortion and loansharking. Defendants contend that the Hessinger affidavit did not establish probable cause. In contending that Judge Jones erred in her findings, defendants dissect each piece of information in the Hessinger affidavit to show that each fact taken alone does not establish probable cause. "This approach, however, is flawed, for the allega-

1. Defendants made several other arguments, which I have considered and rejected as being without merit.

2. Other individuals, who are not defendants in this case, were also named as targets in the order. Defendants Scarpaci and Taddeo were not named as targets, nor were they intercepted.

Although they joined in the Title III motions, they do not have standing to challenge the authorization order. *See United States v. Fury*, 554 F.2d 522, 525–26 (2d Cir.1977); *Alderman v. United States*, 394 U.S. 165, 171–72, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969).

tions contained in a wiretap affidavit should be read as a whole and in a common-sense manner." *Ambrosio*, 898 F.Supp. at 181; *see also Gates*, 462 U.S. at 230, 103 S.Ct. 2317; *United States v. Ruggiero*, 824 F.Supp. 379, 399 (S.D.N.Y.1993), *aff'd*, 44 F.3d 1102 (2d Cir.1995). Keeping these principles in mind and after reviewing the Hessinger affidavit, I conclude that the Hessinger affidavit provided sufficient probable cause to believe that the targets of the electronic surveillance were engaging in criminal activity.

First, the Hessinger affidavit recited information, given by several confidential informants, on the target defendants' illegal activities. The affidavit explained that three confidential sources ("CS–1," "CS–2," and "CS–3") reported that members and associates of organized crime families were involved in fraudulent schemes to manipulate the price of stocks. All three confidential sources stated that the fraudulent schemes included extorting and threatening owners of small brokerage firms. The confidential sources also stated that the target defendants were involved in the schemes.

Second, the confidential informants gave very specific detail on how the targets were effectuating the fraudulent schemes. For example, one informant, CS–2, described a scheme termed a "clean up" operation, pursuant to which members and associates of organized crime families would take over a company that was in financial straits and merge it with other companies that had been temporally infused with cash to create the facade that the newly created company had a greater net worth than it actually had. Once it appeared that the merged company was financially solvent, steps were taken to trade the company's stock in the market. Additionally, various stock brokers would be given "kickbacks" to promote the stock and some of the defendants or their associates would purchase the stock before the price started to go up. (Hessinger Aff. ¶ 17). According to the informants, the stock price would then go up when the merged company appeared to be financially sound and there

appeared to be demand for the company's stock. At that point, defendants would sell at the higher price. They would then remove the capital from the company.

Third, investigations conducted by the FBI confirmed the veracity of statements made by the confidential informants. For example, CS–2 revealed that Lombardo and his partner defendant Irwin Schneider "cleaned up" a company named Global Spill Management ("GSM"). Independent investigations revealed that on June, 1996, GSM announced its merger with Phoenix Wrecking. According to SEC records, Begonia Co., Inc., d/b/a The Morrison Hotel, owned two-thirds of the stock of Phoenix Wrecking and made a $1.1 million loan to Phoenix Wrecking prior to the merger being announced. The affidavit also revealed that when FBI agents went to the address listed for the Morrison Hotel there were no signs of any such hotel and they found what appeared to be a residential building.

Additionally, toll records for Lombardo's cellphone showed that he called individuals who CS–2 stated were participants in the illegal scheme. Toll records also revealed that Lombardo made calls to companies that CS–2 stated were targets of the clean-up operations. (Hessinger Aff. ¶ 48). Finally, the affidavit established that the confidential informants had been used in the past and were reliable.

In short, the Hessinger affidavit supported Judge Jones's finding that probable cause existed to believe that the targets were engaging in criminal activity.

Moreover, even assuming that the Hessinger affidavit did not establish probable cause, the interceptions were performed in good faith reliance on Judge Jones's order. Hence, they should not be suppressed for lack of probable cause.[3] *See Ambrosio*, 898 F.Supp. at 186–89 (good faith exception applies to wiretaps).

### 2. *Minimization*

 Several of the defendants claim that the government failed to adequately

---

**3.** Defendants contend that Hessinger made false statements and reckless omissions in preparing his affidavit, and, therefore, the good faith excep-

tion should not apply. Defendants, however, presented no evidence to support this claim.

minimize and request a hearing on the matter. When government agents are intercepting communications, pursuant to Title III, the law does not "forbid the interception of all nonrelevant conversations, but rather instructs the agents to conduct the surveillance in such a manner as to 'minimize' the interception of such conversations." *Scott v. United States*, 436 U.S. 128, 140, 98 S.Ct. 1717, 56 L.Ed.2d 168 (1978). The government bears the initial burden of establishing that minimization requirements were met. *United States v. Cirillo*, 499 F.2d 872, 880–81 (2d Cir.1974).

■ Here, the government has demonstrated that it adhered to minimization requirements. Before wiretap monitoring began, the government held meetings to explain the general requirements of minimization to Joint Organized Crime Task Force members who would be monitoring the calls. (Gov. Wiretap Mem. at 32). Moreover, everyone who monitored communications received, and was required to read, electronic surveillance instructions prepared by Assistant United States Attorneys, which were also posted at the monitoring plant. (Gov. Wiretap Mem. at 32). The instructions set out the criminal offenses that were being investigated and stated: "You should listen to the beginning of each conversation only so long as is necessary to determine the nature of the conversation .... *If you determine that the conversation is not a criminal conversation then turn off the machine.*" (Emphasis in the original). The procedures followed by the government in this investigation complied with minimization requirements. *See United States v. Hinton*, 543 F.2d 1002, 1011 (2d Cir.1976); *United States v. Santoro*, 647 F.Supp. 153, 160 (E.D.N.Y.1986); *United States v. Rizzo*, 491 F.2d 215, 217 (2d Cir.1974).

Defendants make two principal arguments in response to the government's contention that it minimized.

First, defendants point out that only a small percentage of the intercepted calls were minimized, and they suggest that this undisputed fact shows that the agents did not properly minimize. The fact that a large percentage of non-pertinent communications were intercepted, however, does not preclude a finding that the government met its obligation to minimize. *See Scott v. United States*, 436 U.S. 128, 140, 98 S.Ct. 1717, 56 L.Ed.2d 168 (1978). Many of the intercepted calls lasted less than two minutes and thus they did not need to be minimized. *See United States v. Capra*, 501 F.2d 267, 275 (2d Cir.1974) (minimization is not required in calls under two minutes). Additionally, where the government is investigating a broad criminal conspiracy, the minimization requirements are not as stringently enforced. *See Scott*, 436 U.S. at 140, 98 S.Ct. 1717 ("[W]hen the investigation is focusing on what is thought to be a widespread conspiracy more extensive surveillance may be justified in an attempt to determine the precise scope of the enterprise."); *see also United States v. Napolitano*, 552 F.Supp. 465, 476 (S.D.N.Y.1982). The government here was investigating racketeering, securities fraud, extortion, loansharking, money laundering, narcotics trafficking, and gambling.

Second, defendants argue that agents listened to conversations that they knew to be innocent and irrelevant. Defendants' argument is without merit. For example, some of the calls intercepted suggested that defendants had an interest in proceeds from gambling operations:

> On February 7, 1997 at 6:25 p.m., LOMBARDO spoke with an U/M about someone, possibly a gambler, who is "into them" for $28,000, so they have $5,000 coming. U/M said that the person is on a winning streak, so it is not that big a deal, but why should they let him get used to not paying them?

(Lombardo III aff. at ¶ 44). Additionally, the intercepted calls included discussions about shipments of "shrimp" and "coconuts," which government agents reasonably believed were coded conversations that actually dealt with the shipment of drugs. (Lombardo II aff. at ¶¶ 58, 95 & nn. 37, 44). The government was not required to stop listening to these conversations. *See Scott*, 436 U.S. at 140, 98 S.Ct. 1717 (interception of communications was appropriate where the discussions "ap-

parently involved guarded or coded language").

### 3. Exceeding Authorized Time Periods

■ In this case, all wiretap authorizations were for a thirty-day period. Defendants contend that the government exceeded its authorization and monitored for thirty-one instead of thirty days for four monitoring periods. Defendants are correct as to two of the periods (Lombardo IX and Lombardo XI).[4]

Although it is clear that the government monitored for thirty-one *calendar* days with respect to Lombardo IX and Lombardo XI, the government contends that it complied with the authorization orders because it conducted the wiretaps for thirty "24-hour periods." In other words, the government contends that for these purposes a "day" is a 24-hour period while defendants contend that a "day" is a calendar day.

There do not appear to be any cases on point[5] and neither the government nor defendants cite any authority at all. I conclude that for purposes of Title III, a "day" refers to a calendar day and not an increment of 24 hours, at least where the order authorizing the wiretap does not provide otherwise.

First, the language of Title III suggests that a "day" should be interpreted to mean a calendar day. Section 2518(5) provides that a wiretap may not be authorized for more than "thirty days." It further provides that "[s]uch thirty-day period begins on the earlier of the day on which the investigative or law enforcement officer first begins to conduct interception under the order or ten days after the order is entered." This provision makes sense only if "day" means a calendar day and not a 24-hour period. The computation of time with respect to the entry of orders has always been by calendar days and

not by 24-hour periods. In addition, thirty 24-hour periods could span over thirty-one calendar days and ten 24-hour periods could span over eleven calendar days. If Congress had intended a "day" to mean a 24-hour period or if it had intended "thirty days" to mean possibly thirty-one calendar days, it would have used very different language.

Second, courts customarily interpret a "day" to mean a calendar day. *See Channel One Systems Inc. v. FCC*, 848 F.2d 1305, 1306 (D.C.Cir.1988) (interpreting "day" in FCC regulations to mean calendar days); *Burgo v. General Dynamics Corp.*, 122 F.3d 140, 143 (2d Cir.1997) ("Because the most natural interpretation of the bare phrase ten days is clearly ten calendar days, we will not find an ambiguity in the legislative language simply because Congress could have reinforced its meaning with the use of additional language."). There is no reason to define a "day" differently for purposes of Title III.

Third, the government here initially acted as if it believed that a "day" meant a calendar day. For example, monitoring under Lombardo I began on December 30, 1997 at 8 p.m., and the government terminated the wiretap 30 calendar days later, on January 28, 1998 at 11 p.m. The government began monitoring again on January 29, 1998 at 6 p.m., "after the Court's order was signed" authorizing Lombardo II.[6] If the government had actually believed that a "day" meant an increment of 24 hours, then it would have continued monitoring on Lombardo I until January 29 at 8 p.m. Instead, the government ceased monitoring on January 28, the thirtieth calendar day.

■ For these reasons, I hold that "thirty days" means thirty calendar days, not thirty 24-hour periods that may span over thirty-one calendar days. Accordingly, the interceptions made on the thirty-first calendar

---

4. Defendants also argued that the government exceeded its authority and monitored for 31 days in *Lombardo VIII* and *Montevecchi III*. Defendants are mistaken. In those two periods, monitoring did not exceed 30 days.

5. We have found one case that indirectly addresses, but does not decide, the issue. In *United States v. Sklaroff*, 323 F.Supp. 296, 317 (S.D.Fla. 1971), the court held that "[e]ven if the word 'days' were construed not to mean calendar days,

but rather to mean increments of 24 hours from the time of the signing of the order, the interceptions were terminated within the prescribed period." That observation suggests that the court believed "day" meant a calendar day rather than a 24-hour period.

6. February 11, 1997 ten-day report for Lombardo II.

day for Lombardo IX and Lombardo XI are suppressed. To the extent defendants ask that all the wiretap evidence be suppressed because the government exceeded the thirty-day period for these two wiretaps, the request is denied.

### 4. Sealing of Tapes

■ Title III requires the government to make any tape recordings of intercepted conversations immediately available to the judge who authorized the wiretap for sealing upon the expiration of the period of the order or extensions thereof. *See* 18 U.S.C. § 2518(8)(a). The government meets the requirements of the statute if the tapes are sealed within two days of the conclusion of the electronic surveillance. *United States v. Massino*, 784 F.2d 153, 156 (2d Cir.1986). "[W]hen the sealing is not done immediately, the government must provide a satisfactory explanation for the delay." *Id.*

■ Defendants contend that the government failed to seal tapes within two days for three of its periods of electronic surveillance (Lombardo III, Lombardo XI, and Gangi I) and that it has not sealed the tapes at all for one of the periods (Montevecchi II).

A review of the sealing orders reveals that the tapes in question were sealed three days after the authorized wiretap period expired.[7] In each of the periods in question, the authorized period expired on a Friday and the tapes were sealed the following Monday. "Since the government sealed the tapes on the first business day after the surveillance was terminated, there is no legitimate basis for excluding the tapes from evidence." *United States v. Burford*, 755 F.Supp. 607, 612 (S.D.N.Y.1991), *aff'd*, 986 F.2d 501 (1992).

### CONCLUSION

Defendants' motions to suppress the wiretap evidence are denied, except to the extent that any recordings were made after the expiration of the 30-day authorization period, as discussed above. Any recordings made on the 31st calendar day following commence-ment of interceptions for Lombardo IX and Lombardo XI are suppressed.

SO ORDERED.

### *ORDER*

By letter dated January 28, 1999, the government moves for reconsideration of that portion of the Court's decision of January 14, 1999, amended January 27, 1999, granting defendants' motion to suppress conversations intercepted on the thirty-first calendar day following commencement of interceptions. For the reasons set forth in my amended decision, the motion is denied. I add only the following:

First, although the government now purports to cite authority to support its position that the reference in 18 U.S.C. § 2518(5) to "thirty days" really means "thirty 24-hour periods," the government cited none of these authorities in its memorandum of law in opposition to the suppression motions. Indeed, the government cited no authorities at all in its memorandum, as it argued, without support, that a "day" was a "24-hour period." Now that I have ruled, the government finally cites authority.

Second, the government's authorities do not support its position in any event. The fact that the Office of Enforcement Operations ("OEO") interprets a "day" to mean a "24-hour period" is hardly dispositive, as OEO is a branch of the Department of Justice. Likewise, the Second Circuit's decision in *Burgo v. General Dynamics Corp.*, 122 F.3d 140 (2d Cir.1997), which I cited in my decision, is of little help to the government. There, the issue was whether the ten-day period for payment of an award under the Longshore and Harbor Workers' Compensation Act was calculated on the basis of ten *calendar* days or ten *business* days. Although the Court did observe in passing that "[a] day is the period of time during which the earth makes one revolution on its axis, the *average* length of this interval being 24 hours," it squarely held that "the most natu-

---

7. The Gangi I authorization ended on September 12 and the tapes were sealed on September 15. Defendants argue that the time it took to seal these tapes is actually longer because the surveil-lance under Gangi I ended on September 2. Defendants are incorrect, however, because section 2518(8)(a) does not require sealing until "the expiration of the period of the order."

ral interpretation of the bare phrase ten days is clearly ten *calendar* days." 122 F.3d at 143 (emphasis added).

Third, the government's contention that the language of the statute supports its position that "thirty days" means "thirty 24–hour periods" is incorrect. The statute provides:

> Such thirty-day period begins *on* the earlier of the day on which the investigative or law enforcement officer first begins to conduct an interception under the order or ten days after the order is entered.

18 U.S.C. § 2518(5) (emphasis added). If Congress had intended "thirty days" to mean "thirty 24–hour periods," instead of saying the thirty-day period begins "on" the day interceptions begin, Congress would have provided that the thirty-day period begins "when" or "at the time" interceptions begin. That would have made it clear that the clock starts ticking no later than when the interceptions actually begin. Likewise, the language "on the earlier of ... ten days after the order is entered" makes no sense if "day" means "24–hour period." If Congress had intended "ten days" to mean "ten 24–hour periods" from when the order was actually signed, Congress surely-would have used different language, for the starting point for the ten-day period is the entry of the order, not the signing of the order. An order is "entered" when the Clerk's Office dockets it, and Congress surely could not have intended the ten-day period to be triggered precisely at the time a docket clerk chooses to perform the purely ministerial task of entering the order on the docket.

Fourth, the government contends that "it is reasonable to conclude that the 30–day period of authorization consists of 30 consecutive 24–hour periods." Perhaps. Even assuming, however, that the government's interpretation is reasonable, clearly the more reasonable conclusion, and the "most natural interpretation," is that when Congress said "thirty days," it meant "thirty calendar days" and not "thirty 24–hour periods."

Finally, the government contends that even if its interpretation of the statute is incorrect, the Court should reconsider its decision to suppress the conversations intercepted on the thirty-first days because the monitoring agents acted in good faith reliance on the government's interpretation. The good faith exception to the exclusionary rule provides that evidence obtained pursuant to a search warrant later found to be invalid (*e.g.,* for lack of probable cause) need not be suppressed if the seizing officer reasonably relied in good faith on the validity of the warrant. *United States v. Ambrosio,* 898 F.Supp. 177, 186 (S.D.N.Y.1995) (citing *United States v. Leon,* 468 U.S. 897, 918–21, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984)). The good faith exception has been applied by some courts to wiretaps. *See Ambrosio,* 898 F.Supp. at 186–87.

I decline to apply the good faith exception to the situation here. The question is not whether the monitoring agents reasonably relied on a wiretap order that was later determined to be invalid. Rather, the wiretap orders here were properly issued, and they authorized the agents to monitor for no more than "thirty days." The government chose to interpret, incorrectly, in my view, the wiretap orders to permit monitoring for "thirty 24–hour periods." The policy considerations underlying the good faith exception to the exclusionary rule simply do not apply.

Accordingly, the government's motion for reconsideration is denied.[1]

SO ORDERED.

---

1. The government points out in its letter that the Court misidentified the two wiretaps in question as Lombardo IX and XI. They are actually Lom-bardo X and XI and the amended decision is modified to that extent only.